**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Case No. 16-10369 (KJC) |
| | ) | |
| Sundevil Power Holdings, LLC, *et al*. | ) | Chapter 11 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF RAPHAEL T. WALLANDER
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1746, I, Raphael T. Wallander, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.       I am a Principal at Wayzata Investment Partners LLC, a Delaware limited liability company and Minnesota-based private equity firm ("***WIP***"), which is the investment manager to Wayzata Opportunities Fund, LLC and Wayzata Opportunities Fund II, LLC (collectively the "***Wayzata Funds***"). The Wayzata Funds own, directly or indirectly, the equity interests in the above-captioned debtors and debtors in possession (individually a "***Debtor***" and collectively, the "***Debtors***"). Per their respective governing documents, each of the Debtors is "manager-managed." WIP is the "Manager" for purposes of the Delaware Limited Liability Company Act. I have been appointed by the Manager to serve as a responsible officer of each Debtor and an authorized signatory. In such capacity, I am generally familiar with the day-to-day operations, business and financial affairs, and books and records of the Debtors and am authorized to submit this declaration.

---

[1]     The Debtors in these chapter 11 cases, and their respective federal tax identification numbers, are Sundevil Power Holdings, LLC (2308) and SPH Holdco LLC (7777). The Debtors' service address is: 701 East Lake Street, Suite 300, Wayzata, Minnesota 55391.

2.      On the date hereof (the "***Petition Date***"), Sundevil Power Holdings, LLC, a Delaware limited liability company ("***Sundevil***") and SPH Holdco LLC, a Delaware limited liability company ("***SPH Holdco***") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware, thereby commencing the above-captioned bankruptcy cases.

3.      The Debtors are operating and managing their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, an official committee of unsecured creditors has not been appointed in these cases.

4.      To minimize the chapter 11 cases' impact on business operations, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively the "***First Day Pleadings***"). The First Day Pleadings seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Pleading (including the exhibits and schedules thereto) and believe that the relief sought in each First Day Pleading:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption and loss of value to the Debtors' estates, (b) is critical to achieving a successful sale of all or substantially all of Sundevil's assets or the equity interests in Sundevil, and (c) best serves the interests of the Debtors' creditors.  The description of the relief requested and additional facts supporting each First Day Pleading are incorporated herein by reference and included in **Exhibit A** attached hereto.

5.      I submit this declaration to provide an overview of the Debtors, their business, assets and liabilities, and the reasons for commencing these chapter 11 cases, as well as to support the Debtors' chapter 11 petitions and the relief requested in the First Day Pleadings. Unless otherwise indicated herein, all facts set forth in this declaration are based upon my

personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' assets, liabilities, operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## I.      INTRODUCTION

6.      The Debtors are merchant power generators through Sundevil's ownership of two of the four 550 megawatt natural gas-fired power blocks ("***Power Blocks I and II***") of the Gila River Power Station (the "***GRPS***"), located in Gila Bend, Arizona.  Sundevil and the other power block owners sell energy into the Southwest electric power market, specifically the sub-region of Arizona, New Mexico, and Southern Nevada known as the Desert Southwest ("***DSW***").  Most of Sundevil's output is sold at the Palo Verde hub and to California Independent System Operator ("***CAISO***").  Sundevil also sells capacity to CAISO and is capable of reaching other market hubs such as Mead (Southern Nevada) and Four Corners.  The Debtor's sales of energy for 2015 generated approximately $63.9 million in revenue.

7.      The combination of lower than anticipated power demand growth, declining natural gas prices, increased distributed generation (rooftop solar), slower than expected retirement of older, inflexible coal-fired generation and a substantial buildout of utility scale renewable energy sources has contributed to the Debtors' inability to generate sufficient revenue and liquidity to continue to maintain their capital structure on a long term basis.  While the buildout of substantial utility scale renewable resources actually increases the need for flexible generation resources such as those owned by the Debtors, regulated utilities have continued to rely on older, inflexible, carbon intensive, coal-fired generation to meet electric demand needs despite the ability of Sundevil's assets to serve those needs more economically while achieving

comparatively significant reductions in air emissions - carbon dioxide reductions of up to 65%, nitrous oxide reductions of roughly 95% and sulfur dioxide emissions reductions of nearly 99%. While these older coal generation assets are more expensive to operate, and pollute more, regulated utilities have been allowed to continue to pass such costs on to their customers.

8.     Although the Debtors have attempted to find a third-party equity investor or, alternatively, to sell their assets outside of bankruptcy, these efforts have not yet resulted in a binding offer and the Debtors no longer have sufficient funds to continue this process. Sundevil's secured lender has agreed to provide financing in order to continue to operate the business and continue the sale efforts in a chapter 11 case.  The Debtors filed these chapter 11 cases with the goal of continuing the process for a sale of all or substantially all of the assets of Sundevil (the "***Project Assets***") or of all of the equity interests in Sundevil (the "***Equity Interests***") through section 363 of the Bankruptcy Code.

## II.     OVERVIEW OF THE DEBTORS

### A.     The Debtor's Formation and Business

9.     Sundevil was formed in 2010 and SPH Holdco was formed in 2012.  Sundevil is a wholly owned subsidiary of SPH Holdco, which is jointly owned by the Wayzata Funds. Sundevil was formed for the purpose of purchasing Power Blocks I and II of the GRPS. SPH Holdco was formed for the purpose of owning the equity interests in Sundevil and facilitating a secured financing.

10.     Power Blocks I and II began commercial operations in 2003 and were previously owned by Gila River Power, L.P. ("***GRP***").  GRP is an affiliate of Entegra Power Services LLC ("***Entegra***").  Sundevil purchased Block II from GRP in 2010 and Block I from GRP in 2011. Sundevil has made significant capital improvements to both Power Blocks during the course of its ownership.

11.    The GRPS is a 2,200 megawatt natural gas-fired combined-cycle gas turbine facility in Gila Bend, Arizona.[2]  Power Blocks I and II of the GRPS, owned by the Debtor, are capable of producing a combined 1,100 megawatts of power.  Each Power Block consists of two combustion turbines (GE 7FA CTs) and one GE D11 steam turbine.  The Power Blocks each have a separate cooling tower.  Below is a site overview diagram of the GRPS.



12.    Sundevil owns a 50% undivided tenant-in-common interest in the common facilities of the GRPS with the owners of the other two power blocks.  The common facilities include three evaporation ponds, three transmission lines feeding off of a substation transmission yard, a natural gas pipeline lateral for fuel supply, seven on-site groundwater wells for the supply of cooling water, and other facilities such as the control room, warehouse, and office space.  Sundevil also owns an undivided 50% tenant-in-common interest in approximately 1,100 acres

---

2    The GRPS is designated to be a "medium impact facility" by the North American Electricity Reliability Corporation (NERC) (critical infrastructure protection) for 2016.

surrounding the power generation facilities (except for approximately 50 acres which are specifically owned by the owner of another power block).

13.     Sundevil is party to the Second Amended and Restated Ownership Agreement, dated as of December 10, 2014 (the "***Ownership Agreement***"), with Entegra, Tucson Electric Power Company ("***TEP***"), and UNS Electric, Inc. ("***UNS***") (the owners of the remaining power blocks of the GRPS).[3]   The Ownership Agreement sets forth the rights of each of the power block owners with respect to common facilities and shared real property and creates a committee pursuant to which decisions regarding common facilities, budgeting, and other common ownership decisions are made.   The Ownership Agreement has been recorded in the local deed records as a covenant that runs with the land pursuant to that certain Memorandum of the Second Amended and Restated Ownership Agreement.   As part of the Ownership Agreement, Sundevil and other power block owners have also executed a reciprocal easement agreement to facilitate common ownership and use of the facilities.   Under the Ownership Agreement, unanimous consent among the power block owners is required for most decisions regarding common facilities, though a default by an owner can cause a loss of voting rights in certain instances. Below is a chart showing the ownership structure of the GRPS.

---

[3]     TEP and UNS jointly own Power Block III and Entegra owns Power Block IV.



14.     As a pro rata owner of the GRPS, Sundevil has the right to participate in expansion opportunities at the GRPS. The 1,100 acre site includes approximately 600 acres of usable land for expansion. Expansion opportunities are governed by certain restrictions and requirements set forth in the Ownership Agreement.

15.     Gila Bend Operations Co., LLC ("**GBOC**") is a special purpose entity set up to facilitate common ownership of permits used by the owners of the power blocks at the GRPS. Ownership in GBOC is ratably based on ownership of the power blocks (i.e., Sundevil owns 50% of the membership interests in GBOC due to owning 50% of the power blocks). Sundevil is also entitled to appoint two of the four directors of GBOC.

16.     As the permit holder for the entire facility, GBOC is the legal operator for purposes of the permits. Accordingly, each of the owners of the power blocks at the GRPS (including Sundevil) is a party to a separate but substantially identical Operations and

Maintenance Agreement ("*OMA*") with GBOC.  Under these agreements, GBOC, as operator of the GRPS, provides certain operations and maintenance services to all of the power blocks and common facilities, including purchasing and managing inventories, maintaining environmental compliance programs, and maintaining operating permits.  GBOC is paid an annual fee of $150,000 along with the costs associated with operations and management, and a performance bonus, if appropriate.[4]  Through an addendum to the OMA, GBOC subcontracts performance of its operations and maintenance services to EthosEnergy Power Plant Services, LLC ("*EthosEnergy*").

17.     As a consequence of the OMA structure, the Debtors have no employees. EthosEnergy employs a single management team and staff across all four power blocks, consisting of approximately 61 full-time employees.  The cost of management, operations and other shared services are effectively split pro rata between the owners of the power blocks. Shared services and facilities include the natural gas pipeline lateral, water and waste water systems, spare parts inventory, and the control room.

**B.     Material Project Contracts**

18.     In addition to the Ownership Agreement, Sundevil is also a party to a number of material project contracts relating to the management and operation of Power Blocks I and II. The material project contracts include the following:

a) the OMA with GBOC as subcontracted to EthosEnergy.  The OMA is described above.

b) Energy Management Agreement dated as of May 1, 2014 with EDF Energy Trading North America LLC ("*EDF*") (such agreement, the "*EMA*").  EDF is also known as EDF Energy Services, LLC.

---

[4]     Sundevil is responsible for scheduling and procuring fuel, receiving the produced net generation from the power blocks and providing an annual dispatch plan.

c) Firm Transportation Service Agreements under Rate Schedule FTS-5 effective as of June 1, 2015 through October 31, 2020 with Transwestern Pipeline Company, LLC ("***Transwestern***") (such agreement, the "***Transwestern FTA***").

d) Fuel Supply and Asset Management Agreement dated as of June 29, 2015 with EDF (the "***EDF AMA***").

e) Firm Transportation Service Agreement under Rate Schedule FT1 effective as of June 1, 2013 through March 31, 2017 with El Paso Natural Gas Company ("***El Paso***") (such agreement, the "***El Paso FTA***").

f) Asset Management Agreement dated as of May 30, 2013 with Enserco Energy LLC ("***Enserco***") (such agreement, the "***Enserco AMA***"). As of July 1, 2015 this agreement was assigned to Twin Eagle Resource Management, LLC ("***Twin Eagle***") as the result of a merger between Enserco and Twin Eagle.

g) Management Services Agreement dated as of June 1, 2012 with Entegra (the "***Services Agreement***").

h) Power Project Services Agreement dated as of September 9, 2014 with Freestate Management, LLC ("***Freestate***") (such agreement, the "***PPSA***"). Freestate does business as Kelson Energy LLC.

i) Amended and Restated Control Area Services Agreement dated as of September 21, 2004 with Gridforce Energy Management, LLC ("***Gridforce***") (such agreement, the "***CASA***").

j) Amended and Restated Southwest Reserve Sharing Group ("***SRSG***") Participation Agreement dated as of August 28, 2003 between GRP and the various members of SRSG and assigned to Sundevil on January 28, 2015 (the "***SRSG Participation Agreement***").

k) Amended and Restated Interconnection and Operating Agreement, dated as of December 10, 2014, with Arizona Public Service Company ("***APS***") and the owners of the other power blocks at the GRPS (the "***Interconnection Agreement***").

l) Spare Parts Agreement dated as of November 5, 2014 (the "***Spare Parts Agreement***") by and between Sundevil and GRP. [5]

19.    Under the EMA for Sundevil and Power Blocks I and II, EDF serves as the energy manager. In such role, EDF provides power management, fuel management, and scheduling services to Sundevil. These services include marketing and selling, on Sundevil's behalf, the available capacity and power generated by Power Blocks I and II into the Palo Verde

---

[5]    TEP and UNS became parties to the Spare Parts Agreement upon their purchase of Power Block III in December of 2014.

and CAISO markets.  Additionally, EDF administers all invoicing and physical and financial settlement with market participants for power and natural gas except for physical and financial trades with J. Aron & Company that are conducted under a separate ISDA.  Sundevil pays EDF the greater of $20,000 or 2% of generation margin per month for management services fees under the EMA.  On a monthly basis, EDF nets amounts owed under the EMA for revenues and other costs incurred in the sale of power together with other transactions between EDF and Sundevil, all of which are governed by an ISDA 1992 Master Agreement.

20. Sundevil has contracted for 40,000 Dth per day of firm natural gas transportation service from Transwestern through October 31, 2020, under the Transwestern FTA.  Sundevil pays Transwestern a demand charge equal to $0.335 per Dth per day (or approximately $402,000 per month) regardless of the quantity of natural gas transported plus variable charges that are set forth in Transwestern's Gas Tariff, Fifth Revised Volume No. 1, filed with the Federal Energy Regulatory Commission ("**FERC**").  Sundevil has released its transportation rights on the Transwestern pipeline through March 31, 2017 to EDF under the EDF AMA.  Sundevil remains responsible for all demand and variable charges owed to Transwestern during the period of the release.

21.     Pursuant to the EDF AMA, EDF optimizes the available gas transportation for Sundevil, either by using it to support Sundevil's operations or remarketing the gas to third parties.  Sundevil purchases natural gas from EDF under the EDF AMA at an index price plus a fee.  Sundevil also pays a capacity management services fee and receives a credit resulting from gas remarketed to third parties by EDF.

22.     Sundevil has contracted for 21,850 Dth per day of firm natural gas transportation service from El Paso through March 31, 2017 under the El Paso FTA.  Sundevil owes El Paso a

fixed demand charge equal to $0.2371 per Dth per day (or approximately $160,600 per month) regardless of the quantity of natural gas transported. When gas is transported under the El Paso FTA, additional variable charges that are set forth in El Paso's Gas Tariff, Third Revised Volume No. 1A filed with the FERC, are also owed to El Paso by Sundevil. Sundevil has released its transportation rights on the El Paso pipeline through March 31, 2017, to Enserco under the Enserco AMA (discussed below). Sundevil remains responsible for all demand and variable charges owed to El Paso during the period of the release.

23.     Pursuant to the Enserco AMA, Enserco (now doing business as Twin Eagle) optimizes the available gas transportation for Sundevil, either by using it to support Sundevil's operations or remarketing the gas to third parties. Sundevil has the right to purchase natural gas from Enserco under the Enserco AMA on an actual cost basis. Sundevil pays Enserco a monthly base fee for asset management services based upon the amount of natural gas transportation capacity released to Enserco. In addition to the monthly base fee, Sundevil pays an incentive fee to Enserco equal to the greater of (a) 25% of the aggregate revenue in excess of fixed and variable charges in a six month season or (b) $10,000.

24.     Under the Services Agreement, Entegra provides certain energy logistics services, transaction management services, purchasing services, budgeting and accounting services, and regulatory compliance services related to Power Blocks I and II and the common facilities at the GRPS. Sundevil pays Entegra an annual fee of $250,000 for the services provided under the Services Agreement (payable monthly in installments of $20,833) in addition to reimbursement of common inventory, common capital, and common expenses allocated 50% to Sundevil. Sundevil also funds monthly expenses associated with the Services Agreement each month in advance, with a true-up to adjust for actual amounts paid netted against the subsequent month's

payment.  The management fee and expenses are paid together, on or before the 5th of each month.

25.     Additional asset management services are provided by Freestate pursuant to the PPSA.  Under the PPSA, Freestate provides various asset management services to Sundevil, including (a) daily oversight and interactions with EDF regarding the marketing and sale of power, management of pipeline agreements, gas supply, and transmission, (b) technical support, review, planning and analysis of Sundevil's operations, capital projects and maintenance, (c) long-term origination and marketing and (d) regulatory analysis including but not limited to NERC compliance and clean power plan initiatives.  Sundevil pays Freestate a service fee of approximately $35,000 per month.

26.     Under the CASA, Gridforce provides various control area services including monitoring, communication, reporting and coordination services.  Additionally, Gridforce serves as agent for Sundevil with respect to Sundevil's participation in the SRSG (described below).  Sundevil pays Gridforce monthly fees of $88,000 for these services, as well as an annual facility maintenance fee of $10,000.

27.     Sundevil is a participating member of the SRSG, an organization whose members share contingency reserves in order to more efficiently meet reserve requirements established by NERC reliability standards.  Under the SRSG Participation Agreement, Sundevil reduces the overall amount of reserves that Sundevil would otherwise have to carry as a standalone entity with respect to any dispatch.  Additionally, Sundevil can access reserves for a specified period of time in the event of a unit failure in order to fulfill its generation sales obligations.  Costs of the SRSG are shared by the members (including Sundevil) in accordance with the SRSG Participation Agreement.

28.     The Interconnection Agreement provides for, and governs the terms of, interconnection of the GRPS with APS's transmission facilities, including the operation and use of related facilities.  As owner of Power Blocks I and II and a 50% tenant-in-common interest in the common areas of the GRPS, Sundevil has a 50% interest in the Interconnection Agreement.  Under the Interconnection Agreement, the owners of the GRPS (including Sundevil) reimburse APS for certain costs in accordance with the terms of the Interconnection Agreement.

29.     Under the Spare Parts Agreement, the power blocks owners at the GRPS are able to jointly own and utilize spare parts rather than each owner maintaining its own full inventory of spare parts for the facility.  As of Feb. 3, 2016, Sundevil owed approximately $132,877 to other owners pursuant to the terms of the Spare Parts Agreement.  Continued payment of obligations and performance under the Spare Parts Agreement is essential for Sundevil to operate Power Blocks I and II, as Sundevil does not have the financial ability to purchase its own spare parts inventory at this time.

### C.      Summary of Prepetition Indebtedness

30.     Sundevil, as borrower, Beal Bank USA, as lender (the "***Prepetition Lender***"), CLMG Corp., as successor administrative agent (in such capacity and as collateral agent, the "***Prepetition Agent***" and, together with the Prepetition Lender, the "***Prepetition Secured Parties***") are parties to that certain Credit Agreement, dated as of July 23, 2012 (as amended by the Omnibus Amendment Agreement, dated as of July 10, 2014, the Second Amendment to Credit Agreement, dated as of December 4, 2015 and the Third Amendment to Credit Agreement, dated as of February 1, 2016, the "***Prepetition Credit Agreement,***" and together with each of the Loan Documents (each as defined therein), the "***Prepetition Loan Documents***").  The Prepetition Credit Agreement provided for a $160,000,000 term loan credit facility, a $25,000,000 revolving credit facility, which includes the ability to issue letters of credit

thereunder, a $40,000,000 incremental term loan facility and an additional incremental term loan facility consisting of three tranches in the aggregate amounts of $7,700,000, $2,700,000, and $1,500,000 respectively (collectively, the "***Prepetition Credit Facility***").

31.     Pursuant to the Prepetition Loan Documents, the Prepetition Secured Parties were granted first priority liens on, and security interests in, substantially all of Sundevil's assets and property, and the equity interests in Sundevil, subject to certain Permitted Liens (as defined in the Prepetition Credit Agreement).

32.     Sundevil is currently in covenant default under the Prepetition Credit Agreement.

### D.     Current Operational Status of Power Blocks I and II

33.     Power demand in the DSW is seasonal, peaking during the summer months when temperatures are high and reaching a trough in the spring and late fall when temperatures are moderate.  Because of the circumstances discussed in Section III below leading the Debtors to seek relief under chapter 11 of the Bankruptcy Code, along with the seasonal nature of power demand in the DSW, merchant generators like Sundevil tend to run infrequently between November and April.

34.     From November through April, the Debtors work to ensure that Power Blocks I and II are properly maintained and to avoid damage due to systems and equipment remaining idle.  Additionally, seasonal and major outage work is typically scheduled during the November through April timeframe to ensure that Power Blocks I and II will be available when it is economical for them to run.  Sundevil has scheduled its summer readiness outages for the month of April.[6]  Sundevil's power blocks have not dispatched into the market since October 2015 as it

---

[6]     A substantial amount of the costs (estimated at approximately $6,000,000) related to the readiness outage will be paid directly by Sundevil because such costs are specific to Power Blocks I and II.

has not been economical for them to do so, however Power Blocks I and II remain available for dispatch into the day-ahead market if dispatch is economical or needed for system reliability.

35.    Based upon forward market prices, which are currently illiquid and depressed, consistent economic dispatch is expected to begin in June 2016 and continue through the Fall of 2016. The Debtors believe that intermittent periods of dispatch may also arise in April 2016, as a result of significant unit outages that frequently occur in April, and in May, if unseasonably warm weather moves into the DSW. In April and May of 2015, Power Blocks I and II had capacity factors of 2.6% and 38.5% respectively. Capacity factor is calculated as the number of megawatt hours generated in a period over the total possible megawatt hours that could have been generated in a period.

### III.    CIRCUMSTANCES LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

36.    When the Debtors purchased Blocks I and II of the GRPS, they anticipated intermittent generation like solar and wind, coupled with increasing power demand post the financial crisis and coal plant closures due to increased regulation of the coal industry and the age of the coal-fired fleet in the DSW, would drive the need for power towards efficient and flexible clean burning natural gas-fired resources like those owned by the Debtors. Coal-fired retirements and the pace of power demand growth, have not, however, occurred at the rate the Debtors expected. The Debtors' revenue has decreased further due to a number of factors including, without limitation, depressed electricity prices in the relevant market, the current state of natural gas prices, energy efficiency initiatives and the availability of renewable energy sources, specifically utility scale solar and rooftop solar.

37.    Due to continued losses, the Debtors began considering strategic alternatives in early 2015 and in June 2015, commenced an effort to market the Project Assets or the Equity

Interests outside of bankruptcy to one or more third-party investors or buyers. The Debtors hired Jefferies LLC ("*Jefferies*") as a financial adviser to lead this process. Jefferies reached out to numerous potential investors or buyers, and to date no potential counterparty has definitively decided to move forward with an investment in or purchase of the Project Assets or the Equity Interests. While several parties have expressed interest, no party has yet committed to purchase a portion or all of the Project Assets or all of the Equity Interests.

38.     While the Debtors did not realize the economic return they anticipated from Power Blocks I and II, the Project Assets or the Equity Interests should be attractive to a potential purchaser for many reasons. For example, unlike dedicated baseload (coal) or peaking facilities (simple combustion turbines) which are able to only serve one type of generation need or the other, Power Blocks I and II have the ability to operate in many modes (baseload, cycling (turning on and off) or peaking) and the ability to switch between these operating modes on a daily basis, helping the system operators increase both efficiency and reliability. Effectively, Power Blocks I and II are a baseload and peaking resource co-located at one site.

39.     In addition to possessing the characteristics of multiple unit types, Power Blocks I and II are also attractive for the following reasons: (a) with the proper infrastructure in place, the GRPS is well-positioned to sell power into markets beyond the DSW region, including the Southern California market, (b) anticipated population growth in the DSW region would make the purchase of the Project Assets or the Equity Interests an attractive long-term investment, and (c) purchasing Power Blocks I and II is a cost-effective alternative to the significant expense of new construction in the DSW and CAISO. Additionally, when regulations or economics finally force the retirement of older coal-burning generation assets, the Project Assets are a logical alternative for load serving entities at a fraction of the cost of new build generation.

40.     The Debtors, in consultation with their advisors, and in cooperation with the Prepetition Secured Parties, concluded that, based on their financial projections and liquidity constraints, cash on hand alone would be insufficient to fund the Debtors' operations during the pendency of these chapter 11 cases.  Beginning in November of 2015, the Debtors and the Prepetition Secured Parties, represented by separate advisors, began to discuss the possibility of the Prepetition Lender providing debtor-in-possession financing ("***DIP Financing***") to the Debtors in connection with a chapter 11 proceeding.  The Prepetition Lender has agreed to provide up to $45,000,000 in DIP Financing proposed in the motion for DIP Financing filed concurrently with this declaration (the "***DIP Motion***").  The DIP Financing proposed in the DIP Motion was agreed to through a good faith and arms-length negotiation between the Debtor and the Prepetition Secured Parties.

41.     An immediate need exists for the Debtors to obtain funds and liquidity in order to continue operations, administer and preserve the value of their estates, and to fund in full the administrative costs of these chapter 11 cases pending a sale of the Project Assets or the Equity Interests.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, preserve necessary relationships with GRPS co-owners and critical counter-parties, and to maximize the return for all creditors is completely dependent upon the availability of the DIP Financing proposed in the DIP Motion.  In the absence of the availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtors' businesses and an orderly marketing process would not be possible, and serious and irreparable harm to the Debtors and their estates and creditors would occur.

42.     Additionally, the failure to obtain such financing and continue to fund the operating costs of owning the Project Assets will cause defaults under the Ownership

Agreement, the OMA and other key agreements that could significantly impact the value of the Project Assets.

43.     As further described in the DIP Motion, Sundevil, through its financial advisor, sought to obtain DIP Financing from alternative lending sources.  No other party expressed an interest in providing DIP Financing to the Debtors.  I believe that the Prepetition Secured Parties' proposal is in the best interests of the Debtors' estates and creditors.

44.     The Debtors will pursue a sale of all or substantially all of the Project Assets or of all of the Equity Interests, which sale would be effectuated through section 363 of the Bankruptcy Code.  The Prepetition Secured Parties and the secured parties under the DIP Financing will have the right to credit bid up to the full amount of their respective claims.  The sale process is more fully described in the sale and bid procedures motion filed contemporaneously herewith.

45.     The Debtors commenced these chapter 11 cases to address the Debtors' financial obligations and operating challenges, generate sufficient liquidity to fund their operations and sale process and maximize value for the Debtors' estates and stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 11, 2016

_/s/ Raphael T. Wallander_
Raphael T. Wallander

## **Exhibit A**

**Evidentiary Support for First Day Pleadings**

## EVIDENTIARY SUPPORT FOR FIRST DAY PLEADINGS[7]

A. **Debtors' Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases ("*Joint Administration Motion*").**

1.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order consolidating the administration of these chapter 11 cases for procedural purposes only, and granting related relief.  Many, if not virtually all, of the motions, applications, hearings, and orders that will arise in these chapter 11 cases will affect all of the Debtors.  For example, nearly all of the relief sought by the Debtors in the First Day Pleadings is sought on behalf of all of the Debtors.  In order to optimally and economically administer the chapter 11 cases, such cases should be jointly administered, for procedural purposes only, under the case number assigned to Debtor Sundevil Power Holdings, LLC.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

B. **Debtors' Motion for Entry of Interim and Final Orders Authorizing Continued Use of the Debtors' Cash Management System ("*Cash Management Motion*").**

2.      Prior to commencing these chapter 11 cases, the Debtors managed their cash, receivables, and payables through a cash management system (the "*Cash Management System*").  The Cash Management System is designed to efficiently collect, transfer, and disburse funds for the Debtors.

3.      By the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to: (a) continue to operate their Cash Management System; and (b) honor certain prepetition obligations related thereto.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

---

[7]    Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the applicable First Day Pleading.

4.      I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' business and any disruption in the Debtors' use of the Cash Management System would significantly disrupt the Debtors' operations.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**C.      Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Taxes ("*Taxes Motion*").**

5.      The Taxes Motion seeks the authority to remit and pay Taxes that accrued before the Petition Date and will become payable during the pendency of these cases in an aggregate amount not to exceed $2.47 million.  The Debtors also request that the Court authorize applicable financial institutions, when the Debtors so request, to receive, process, honor, and pay any and all electronic payment requests in respect of the Taxes.

6.      In the ordinary course of business, the Debtors incur property and use taxes, as more fully described in the Taxes Motion.  The Debtors estimate that approximately $2.47 million in Taxes and Fees relating to the prepetition period will become due and owing to the Authorities after the Petition Date, and approximately $7,500 of this amount will become due and payable within 21 days of the Petition Date.

7.      The Debtors' failure to pay prepetition Taxes may cause the Authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, preventing the Debtors from doing business in certain jurisdictions, or seeking to lift the automatic stay, all of which would greatly disrupt the Debtors' operations.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**D.      Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Performance Under Energy Trading Contracts and (II) Pay Prepetition Amounts Related Thereto ("*Energy Trading Motion*").**

8.      The Energy Trading Motion seeks an order:  (i) authorizing the Debtors to honor and continue performing under Energy Trading Contracts (as defined below), (ii) authorizing the Debtors to honor, pay, and/or otherwise satisfy any and all obligations under the Energy Trading Contracts in a manner consistent with prepetition practices; and (iii) authorizing and directing financial institutions to receive, process, honor and pay electronic payment requests relating to the Energy Trading Contracts, whether issued or presented prior to or after the Petition Date.  In addition, the Debtors request that the Court schedule a Final Hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

9.      I believe that the relief requested in the Energy Trading Motion is necessary to preserve critical business and trading relationships and to maximize the value of their chapter 11 estates for the benefit of all parties in interest.  As described in detail in the Energy Trading Motion, prior to the Petition Date the Debtors entered into and performed under the Energy Trading Contracts, which may be subject to safe harbor protections for "forward contracts" under the Bankruptcy Code.  These protections may allow the counterparties to the Energy Trading Contracts to terminate the contracts upon commencement of these chapter 11 cases, causing significant disruptions to the Debtors' business operations.  In addition, the counterparties to the Energy Trading Contracts may take the position that the Debtors need Court approval to perform under the contracts postpetition.  Accordingly, on behalf of the Debtors, I respectfully submit that the Energy Trading Motion should be approved.

E.     **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Amounts to Co-Owners and Other Counterparties Under Material Operating and Project Agreements ("*Material Project Agreements Motion*").**

10.     In order to ensure the safe, efficient, and effective operation of the Project Assets (i.e., Power Blocks I and II), Sundevil entered into certain contracts described in paragraphs 13 through 29 of the First Day Declaration (collectively, as may be amended and including related and ancillary agreements, the "***Material Project Agreements***") with certain parties including (in certain instances) the other co-owners of the GRPS (the "***Material Service Providers***").   The Material Project Agreements provide for essential operating, management, and maintenance services and all add intrinsic value to the Power Blocks I and II and GRPS.

11.     As of the Petition Date, the Debtors estimate that the aggregate amount owing prepetition under the Material Project Agreements is approximately $1,608,890, subject to adjustment on account of ordinary course reimbursement and netting practices under a number of the Material Project Agreements.  Substantially all of this amount relates to amounts payable under the Ownership Agreement, OMA, Services Agreement, Interconnection Agreement, Spare Parts Agreement, Transwestern FTA and El Paso FTA.  The DIP Credit Agreement and DIP Budget (each as defined in the DIP Motion) provide for the payment of all amounts, including prepetition amounts, owed under the Material Project Agreements on a timely basis and in the ordinary course of business.

12.     By the Material Project Agreements Motion, the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to honor, pay, and/or otherwise satisfy any and all prepetition obligations under the Material Project Agreements (as defined below) in a manner consistent with prepetition practices; (ii) authorizing and directing financial institutions to receive, process, honor and pay electronic payment requests relating to the Material Project

Agreements, whether issued or presented prior to or after the Petition Date; and (iii) scheduling a final hearing to consider entry of the Final Order, no later than 25 days after the Petition Date.

13.      I believe that the continued performance of all prepetition obligations under the Material Project Agreements is essential to preserve the value of the Debtors' Project Assets, and that failure to do so could materially and permanently impair value.  Additionally, with regards to the Material Project Agreements with the common owners of the GRPS, there are no available means by which the Debtors can readily replicate the essential benefits of such agreements at this time.  Furthermore, most of the Material Project Contracts are also within the definition of "Material Project Documents" under the Prepetition Credit Agreement and DIP Credit Agreement.  As such, they serve as part of the collateral package which secures (or will secure) these credit facilities.  Indeed, certain defaults under the Material Project Documents are a default under both the Prepetition Credit Agreement and the DIP Credit Agreement. Accordingly, on behalf of the Debtors, I respectfully submit that the Material Project Agreements Motion should be approved.

      **F.**     **Debtors' Motion for Entry of an Order Authorizing the Debtors to Continue Insurance Policies and Pay Related Obligations ("*Insurance Motion*").**

14.      In the ordinary course of business, the Debtors maintain certain insurance policies (collectively, the "***Insurance Policies***") that are administered by various third-party insurance carriers (collectively, the "***Insurance Carriers***"). These policies provide coverage for the Debtors' property, general liability, automobile liability, and umbrella coverage[8].  In addition, these policies provide premises pollution liability coverage for Sundevil Power Holdings LLC.

---

[8]      The Debtors' current property, general liability, automobile liability, and umbrella coverage Insurance Policies are part of a portfolio insurance policy maintained by Wayzata Investment Partners LLC.  Upon renewal in March 2016, the Debtors will obtain property, general liability, automobile liability, and umbrella coverage insurance policies on a standalone basis.

The aggregate annual premium for the Insurance Policies is approximately $850,000, plus applicable taxes and surcharges.

15.    By the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to: (a) continue existing insurance coverage entered into prepetition and satisfy payment obligations related thereto; and (b) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business.

16.    Continuation of the Insurance Policies and entry into new insurance is essential to the preservation of the value of the Debtors' businesses and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the Office of the United States Trustee's requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

    **G.**    **Debtors' Application for Entry of an Order Authorizing and Approving the Appointment of Garden City Group LLC as Claims and Noticing Agent and Granting Related Relief ("*Claims Agent Application*").**

17.    Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Garden City Group, LLC as the Claims and Noticing Agent for the Debtors in their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

18.    Garden City Group is one of the country's leading chapter 11 administrators and its professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity.  Garden City Group's professionals have acted as the official claims and noticing agent in many large bankruptcy cases in this District and in other districts nationwide.

Garden City Group is well-qualified to provide experienced claims and noticing services in connection with these Chapter 11 Cases.

19.    I believe that by appointing GCG as the Claims and Noticing Agent in these chapter 11 cases, the distribution of notices and the processing of claims will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of processing what may be an overwhelming number of claims.  Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Application should be approved.

**H.    Debtors' Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Current Income and Expenditures, Executory Contracts and Unexpired Leases, and Statements Of Financial Affairs ("*SOFAs and Schedules Extension Motion*").**

20.    Pursuant to the SOFAs and Schedules Extension Motion, the Debtors are seeking entry of an order extending the 14-day period for the Debtors to file schedules of assets and liabilities under Bankruptcy Rule 1007(c) for an additional 16 days, to the date that is 30 days after the Petition Date.

21.    Due to the Debtors limited resources and their prepetition focus on preparing for a smooth transition into chapter 11, the Debtors have not yet had a sufficient opportunity to complete the preparation of the Schedules and Statements and do not anticipate having the Schedules and Statements ready for filing within the 14-day period prescribed by Bankruptcy Rule 1007(c).  The Debtors expect that it will take a total of 30 days to complete, review, and file the Schedules and Statements with the Court.  Accordingly, on behalf of the Debtors, I respectfully submit that the SOFAs and Schedules Extension Motion should be approved.

**I.**      **Motion for Entry of an Order (I) Establishing Bar Dates and Procedures and (II) Approving the Form and Manner of Notice Thereof (the "*Bar Date Motion*").**

22.      By the Bar Date Motion, the Debtors seek entry of an order, (a) establishing claims bar dates and related procedures; and (b) approving the form and manner of notice thereof. Specifically, the Debtors request that the Court establish: (a) the deadline for holders of prepetition claims ("*General Claims*") to file proofs of claim and proofs of interest as **April 11, 2016, at 5:00 p.m. (EST)** (the "*Claims Bar Date*"), 60 days after the Petition Date; and (b) the deadline for governmental entities to file proofs of claim as **August 11, 2016 at 5:00 p.m. (EST)** (the "*Governmental Bar Date*" and, together with the Claims Bar Date, the "*Bar Dates*"), which is more than 180 days of the Petition Date.

23.      I believe that the procedures and noticing efforts detailed in the Bar Date Motion, and the establishing of the Bar Dates, will or should provide claimants with the information necessary to be able to file claims in these cases.   Accordingly, on behalf of the Debtors, I respectfully submit that the Bar Date Motion should be approved.