## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Case No. 16-10369 (KJC) |
| | ) | |
| Sundevil Power Holdings, LLC, *et al.* | ) | Chapter 11 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

### DEBTORS' MOTION FOR ENTRY OF ORDERS (I) ESTABLISHING BIDDING AND SALE PROCEDURES; (II) APPROVING THE SALE OF ASSETS; AND (III) GRANTING RELATED RELIEF

Sundevil Power Holdings, LLC ("**Sundevil**") and SPH Holdco LLC ("**SPH Holdco**"), the debtors and debtors in possession (collectively, the "**Debtors**"), file this *Motion for Entry of Orders (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief* (the "**Motion**") and in support respectfully state as follows:

### JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  The Debtors confirm their consent pursuant to Rule 9013-1(f) of the *Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware* (the "**Local Rules**") to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court,

---

[1]      The Debtors in these chapter 11 cases, and their respective federal tax identification numbers, are Sundevil Power Holdings, LLC (2308) and SPH Holdco LLC (7777).  The Debtors' service address is:  701 Lake Street E, Suite 300, Wayzata, Minnesota 55391.

absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507, of title 11 of the United States Code (the "***Bankruptcy Code***"), rules 2002, 6004, 6006, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure ("***Bankruptcy Rules***"), and Local Rule 6004-1.

## PROCEDURAL BACKGROUND

4.      On February 11, 2016 (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, an official committee of unsecured creditors has not been appointed in these cases.

5.      Additional information regarding the Debtors and these cases, including the Debtors' business, organizational structure, financial condition, and the reasons for and objectives of these cases, is set forth in the *Declaration of Raphael T. Wallander in Support of Chapter 11 Petitions and First Day Pleadings*, filed contemporaneously herewith and incorporated herein by reference (the "***First Day Declaration***").

## RELIEF REQUESTED

6.      By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Bid Procedures Order***"), granting the following relief:

a.    authorizing and approving bid procedures set forth in **Annex 1** to the Bid Procedures Order (the "***Bid Procedures***")[2] to be employed in connection with the proposed sale (the "***Sale***") of substantially all of the assets of the Debtors, wherever located (the "***Assets***");

b.    authorizing the Debtors to enter into one or more asset purchase agreements (any such agreement, an "***Asset Purchase Agreement***") with one or more potential "stalking horse" bidders (each, a "***Stalking Horse Bidder***") and to provide certain bid protections (the "***Bid Protections***") to any Stalking Horse Bidder in connection therewith;

c.    scheduling an auction (the "***Auction***") and a hearing (the "***Sale Hearing***") to consider approval of the Sale;

d.    authorizing and approving procedures (the "***Assignment Procedures***") to be employed in connection with the identification and assumption of certain executory contracts (the "***Assumed Contracts***") and unexpired leases (the "***Assumed Leases***") and assignment of such Assumed Contracts and Assumed Leases in connection with the Sale; and

e.    approving the manner and form of notice of the Auction, the Sale Hearing, and the Assignment Procedures, substantially in the forms attached hereto as **Exhibit B** (the "***Sale Notice***") and **Exhibit C** (the "***Assumption Notice***").

The Debtors further seek entry of an order, substantially in the form attached hereto as

**Exhibit D** and as it may be reasonably modified by the Successful Bidder(s) (as defined

below) (the "***Sale Order***") granting the following relief:

(i)    approving the Sale of the Assets, or any combination thereof, to one or more Successful Bidders free and clear of liens, claims, interests and encumbrances;

(ii)   approving the assumption and assignment by the Debtors of the Assumed Contracts and Assumed Leases to the Successful Bidder(s); and

(iii)  granting certain related relief.

In support of this motion, the Debtors incorporate the statements contained in the First

Day Declaration filed contemporaneously herewith and further respectfully state as follows:

---

[2]    Capitalized terms used but not otherwise defined herein are used as defined in the Bid Procedures.

84605864.1

## THE DEBTORS' ASSETS AND SALE PROCESS

7.      The Debtors are merchant power generators through Sundevil's ownership of two of the four 550 megawatt natural gas-fired power blocks ("***Power Blocks I and II***") of the Gila River Power Station (the "***GRPS***"), located in Gila Bend, Arizona.  Sundevil and the other power block owners sell energy into the Southwest electric power market, specifically the sub-region of Arizona, New Mexico, and Southern Nevada known as the Desert Southwest ("***DSW***").  Most of the Sundevil's output is sold at the Palo Verde hub and to California Independent System Operator ("***CAISO***").  Sundevil also sells capacity to CAISO and is capable of reaching other market hubs such as Mead (Southern Nevada) and Four Corners.  As of November 2015, the Debtor's sales of energy for 2015 generated approximately $63.9 million in revenue.

8.      GRPS is a 2,200 megawatt natural gas-fired combined-cycle gas turbine facility in Gila Bend, Arizona.  Power Blocks I and II of the GRPS, owned by the Debtor, are capable of producing a combined 1,100 megawatts of power.  Each Power Block consists of two combustion turbines (GE 7FA CTs) and one GE D11 steam turbine.  The Power Blocks each have a separate cooling tower.

9.      Sundevil owns a 50% undivided tenant-in-common interest in the common facilities of GRPS with the owners of the other two power blocks.  The common facilities include three evaporation ponds, three transmission lines feeding off of a substation transmission yard, a natural gas lateral for fuel supply and other facilities such as the control room, warehouse, and office space.  Sundevil also owns an undivided 50% tenant-in-common interest in approximately 1,100 acres surrounding the power generation facilities (except for approximately 50 acres which are specifically owned by the owner of another power block).

84605864.1

10.     As a pro rata owner of the GRPS, Sundevil has the right to participate in expansion opportunities at the GRPS.   The 1,100 acre site includes approximately 600 acres of usable land for expansion.   Expansion opportunities are governed by certain restrictions and requirements set forth in the Ownership Agreement.

11.     Gila Bend Operations Co., LLC ("**GBOC**") is a special purpose entity set up to facilitate common ownership of permits used by the owners of the power blocks at GRPS. Ownership in GBOC is ratably based on ownership of the power blocks (i.e., Sundevil owns 50% of the membership interests in GBOC due to owning 50% of the power blocks).  Sundevil is also entitled to appoint two of the four managers of GBOC.

12.     As the permit holder for the entire facility, GBOC is the legal operator for purposes of the permits.   Accordingly, each of the owners of the power blocks at GRPS (including Sundevil) is a party to a separate but substantially identical Operations and Maintenance Agreement ("*OMA*") with GBOC.  Under these agreements, GBOC, as operator of the GRPS, provides certain operations and maintenance services to all of the power blocks and common facilities, including purchasing and managing inventories, maintaining environmental compliance programs, and maintaining operating permits. Through an addendum to the OMA, GBOC subcontracts performance of its operations and maintenance services to EthosEnergy.

13.     As a consequence of the OMA structure, the Debtors have no employees. EthosEnergy employs a single management team and staff across all four power blocks, consisting of approximately 61 full-time employees.  The cost of management, operations and other shared services are effectively split pro rata between the owners of the power blocks. Shared services and facilities include the natural gas pipeline lateral, water and waste water systems, spare parts inventory, and the control room.

84605864.1

14.     When the Debtors purchased Blocks I and II of the GRPS, they anticipated intermittent generation like solar and wind, coupled with increasing power demand post financial crisis and coal plant closures due to increased regulation of the coal industry and the age of the coal fired fleet in the DSW, would drive the need for power towards efficient and flexible clean burning natural gas-fired resources like those owned by the Debtors.  Coal-fired retirements and the pace of power demand growth, have not, however, occurred at the rate the Debtors expected. The Debtors' revenue has decreased further due to a number of factors including, without limitation, depressed electricity prices in the relevant market, the current state of natural gas prices, energy efficiency initiatives and the availability of renewable energy sources, specifically utility scale solar and rooftop solar.

15.     Due to continued business losses, the Debtors began considering strategic alternatives in early 2015 and, in June 2015, commenced an effort to market the Assets outside of bankruptcy to one or more third-party investors or buyers.  The Debtors hired Jefferies LLC ("***Jefferies***" or the "***Financial Advisor***") as a financial adviser to lead this process.  Jefferies reached out to numerous potential investors or buyers and, to date, no potential counterparty has definitively decided to move forward with an investment in or purchase of the Assets.  While several parties have expressed interest, no party has yet committed to purchase a portion or all of the Assets.

16.     While the Debtors did not realize the gross margins they anticipated from Power Blocks I and II, the Assets should be attractive to a potential purchaser for many reasons.  For example, unlike dedicated baseload (coal) or peaking facilities (simple combustion turbines) which are able to only serve one type of generation need or the other, Power Blocks I and II have the ability to operate in many modes (baseload, cycling (turning on and off) or peaking) and the

ability to switch between these operating modes on a daily basis, helping the system operators increase both efficiency and reliability.  Effectively, Power Blocks I and II are a baseload and peaking resource co-located at one site.

17.     In addition to possessing the characteristics of multiple unit types, Power Blocks I and II are also attractive for the following reasons: (a) with the proper infrastructure in place, the GRPS is well-positioned to sell power into markets beyond the DSW region, including the Southern California market, (b) anticipated population growth in the DSW region would make the purchase of the Assets an attractive long-term investment, and (c) purchasing Power Blocks I and II is a cost-effective alternative to the significant expense of new construction in the DSW and CAISO.  Additionally, when regulations or economics finally force the retirement of older coal-burning generation assets, the Assets are a logical alternative for load serving entities at a fraction of the cost of new build generation.

18.     Sundevil, as borrower, Beal Bank USA, as lender (the "*Prepetition Lender*") and CLMG Corp., as successor administrative agent (in such capacity and as successor collateral agent, the "*Prepetition Agent*" and, together with the Prepetition Lender, the "*Prepetition Secured Parties*") are parties to that certain Credit Agreement, dated as of July 23, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "*Prepetition Credit Agreement*" and, together with each of the Loan Documents (each as defined therein), the "*Prepetition Loan Documents*").  The Prepetition Secured Parties assert that, as of the Petition Date, the DIP Borrower was indebted and liable to the Prepetition Secured Parties under the Prepetition Loan Documents in the aggregate principal amount of not less than $230,700,000 with respect to the Prepetition Credit Facility and not less than $500,000 of undrawn Letters of Credit (as defined in the Prepetition Credit Agreement) plus accrued (both before and after the

84605864.1

Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the Prepetition Loan Documents.  Pursuant to the Prepetition Loan Documents, the Prepetition Secured Parties were granted first priority liens on, and security interests in substantially all of the DIP Borrower's assets and property, subject to certain Permitted Liens (as defined in the Prepetition Credit Agreement), and the equity interests in the DIP Borrower.

19.     The Debtors, in consultation with their advisors, and in cooperation with the Prepetition Secured Parties, concluded that, based on their financial projections and liquidity constraints, cash on hand alone would be insufficient to fund the Debtors' operations during the pendency of these chapter 11 cases.  Beginning in November of 2015, the Debtors and the Prepetition Secured Parties, represented by separate advisors, began to discuss the possibility of the Prepetition Lender providing debtor-in-possession financing ("*DIP Financing*") to the Debtors in connection with a chapter 11 proceeding.  The Prepetition Lender has agreed to provide up to $45,000,000 in DIP Financing proposed in the motion for DIP Financing filed concurrently with this Motion. The Debtors commenced these chapter 11 cases to address the Debtors' financial obligations and operating challenges, generate sufficient liquidity to fund their operations and sale process and maximize value for the Debtors' estates and stakeholders.

## BID PROCEDURES

20.     The Bid Procedures are designed to maximize value for the Debtors' estates and will enable the Debtors to review, analyze, and compare all bids received to determine which bid is in the best interests of the Debtors' estates and creditors.  The Bid Procedures describe, among other things, the procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the

84605864.1

foregoing Bid Procedures.  The Debtors submit that the Bid Procedures will enable the Debtors

to conduct a sale process that will maximize the value of their estates.

21.    The salient terms of the Bid Procedures are as follows[3]:

**Interested Parties**.  Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the bidding process (the "***Bidding Process***"), each interested person or entity (each, an "***Interested Party***") must deliver the following to the Financial Advisor[4] so as to be received no later than 5:00 p.m. (Eastern Time) on April 14, 2016:

(a)    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors;

(b)    a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, that the Interested Party has a *bona fide* interest in purchasing all or a portion of the Assets; and

(c)    sufficient information, as defined by the Debtors, to allow the Debtors to determine that the Interested Party has the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale, including, but not limited to, current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in their discretion).

If the Debtors determine, after receipt of the items identified above, that an Interested Party has a *bona fide* interest in purchasing all or a portion of the Assets, no later than two business days after the Debtors make that determination, such Interested Party will be deemed a "***Potential Bidder***" and the Debtors will deliver to such Potential Bidder: (a) an electronic copy of a proposed asset purchase agreement (the "***Proposed Agreement***") in the form attached hereto as **Exhibit E** and (b) access information for the Debtors' confidential electronic data room concerning the Assets.  The Debtors reserve the right to determine whether an Interested Party has satisfied the above participation requirements such that it is eligible to be a Potential Bidder.  The Debtors shall provide the administrative agent (the "***DIP Agent***") and lenders (the "***DIP Lenders***") party to the Debtors' post-petition financing facility and the Prepetition Agent and Prepetition Lender party to the Prepetition Credit Agreement with a list of all Interested Parties and all Potential Bidders.  Any dispute concerning whether an Interested Party should be designated as a Potential Bidder shall be resolved by the Bankruptcy Court.

---

[3]    The brief description of the Bid Procedures contained herein is for the convenience of the Bankruptcy Court and parties in interest. In the event of any inconsistency or ambiguity between the terms of the Bid Procedures and the Motion, the Bid Procedures shall control.

[4]    The Financial Advisor's contact information is: Jefferies, 520 Madison Avenue, 7th Floor, New York, New York 10022 (Attn: Kevin Phillips (kphillips@jefferies.com) and Richard Morgner (rmorgner@jefferies.com)).

84605864.1

**Due Diligence**.  Until the Bid Deadline (as defined below), in addition to access to the Data Room, the Debtors will provide any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors determine to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be directed to the Financial Advisor.  The Debtors, with the assistance of the Financial Advisor, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.  In the event that any such due diligence material is in written form and has not previously been provided to any other Potential Bidder, the Debtors will simultaneously provide such material to all Potential Bidders, the DIP Agent and the Prepetition Agent.

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (a) the Potential Bidder does not become a Qualified Bidder (as defined below), from and after the Bid Deadline or (b) the Bidding Process is terminated in accordance with its terms.

**Qualified Bids**.  Each offer, solicitation or proposal by a Potential Bidder must satisfy each of the conditions to be deemed a "***Qualified Bid***" and for the Potential Bidder to be deemed a "***Qualified Bidder***" set forth in "Bid Deadline" and "Bid Requirements" below. For avoidance of doubt, Potential Bidders may submit bids for individual Assets or combinations of Assets and are not required to submit bids for all Assets.

**Bid Deadline**.  A Potential Bidder who desires to be a Qualified Bidder must deliver the Required Bid Documents (as defined below) so as to be received not later than 12:00 p.m. (Eastern Time) on April 29, 2016 (the "***Bid Deadline***"), to the Financial Advisor, 520 Madison Avenue, 7th Floor, New York, New York 10022 (Attn: Kevin Phillips (kphillips@jefferies.com) and Richard Morgner (rmorgner@jefferies.com)) with copies to Drinker Biddle & Reath, LLP, 222 Delaware Avenue, Suite 1400, Wilmington, Delaware 19801 (Attn: Steven Kortanek    (Steven.Kortanek@dbr.com)    and    Howard    A.    Cohen (Howard.Cohen@dbr.com)), Vinson & Elkins LLP, 666 Fifth Avenue, 26th Floor, New York, New York 10103-0040 (Attn: David S. Meyer (dmeyer@velaw.com)) and Vinson & Elkins LLP, Trammell Crow Center, 2001 Ross Avenue, Suite 3700, Dallas, Texas 75201-2975 (Attn: Paul E. Heath (pheath@velaw.com)).  The Debtors shall provide copies of all Required Bid Documents received to the DIP Agent and the Prepetition Agent.  The Debtors may extend the Bid Deadline with the written consent of the DIP Agent and the Prepetition Agent.  If the Debtors extend the Bid Deadline, the Debtors will promptly notify all Potential Bidders who have signed a confidentiality agreement of such extension.

**Bid Requirements**.  All bids must include the following (the "***Required Bid Documents***"):

- a letter stating that the bidder's offer is irrevocable until August 8, 2016;

- a duly authorized and executed purchase agreement, including the purchase price for the Assets to be purchased, together with all exhibits and schedules, marked to show any amendments and modifications to the Proposed Agreement, and any proposed modifications to the Sale Order; and

- written evidence of a firm commitment for financing, or other evidence of ability to consummate the proposed transaction without financing, that is satisfactory to the Debtors.

In addition, a bid will be considered <u>only</u> if the bid:

- sets forth the contracts and leases to be assumed and assigned;

- sets forth the consideration for the Assets to be purchased and the contracts and leases to be assumed and assigned;

- provides for cash payment of all cure costs for all contracts and leases to be assumed;

- is not conditioned on obtaining financing or on the outcome of unperformed due diligence or corporate, stockholder or internal approval;

- provides evidence satisfactory to the Debtors of the bidder's financial wherewithal and operational ability to consummate the transaction and satisfy its adequate assurance of future performance requirement with respect to any executory contract or unexpired lease to be assigned to it, including the ability to obtain all necessary regulatory approvals and the anticipated timeframe for receiving such approvals;

- is irrevocable until August 8, 2016;

- is accompanied by a deposit by wire transfer to the Debtors equal to 10% of the cash purchase price (any such deposit, a "***Good Faith Deposit***"), with such deposit to constitute liquidated damages if the Potential Bidder shall default with respect to its offer;

- provides for the closing of the transaction by no later than July 7, 2016;

- sets forth the representatives who are authorized to appear and act on behalf of the bidder;

- includes evidence of the Qualified Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including with respect to (a) funding payment by the Qualified Bidder of all cure costs associated with the contracts and leases proposed in its bid to be assumed by the Debtors and assigned to the Qualified Bidder and (b) providing adequate assurance of such Qualified Bidder's ability to perform in the

future the contracts and leases proposed in its bid to be assumed by the Debtors and assigned to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases; and

• is received on or before the Bid Deadline.

**<u>Stalking Horse Bid Protections</u>**.  If the Debtors execute any asset purchase agreement with any Stalking Horse Bidder(s), the Debtors may, upon the consent of the DIP Lenders (in their sole discretion), provide such Stalking Horse Bidder(s) with a breakup fee in an amount to be negotiated by the Debtors in their discretion, based on the totality of the circumstances, including, without limitation, the purchase price and other terms and conditions of the Asset Purchase Agreement, but in no event more than three percent (3%) of the cash portion of the purchase price, payable only from the proceeds of an alternative sale transaction, and satisfied as a super-priority administrative expense, and subject to customary conditions and limitations.

**<u>Auction</u>**.  In the event that the Debtors timely receive at least one Qualified Bid with respect to the Assets, the Debtors shall conduct an auction (the "**_Auction_**"). The Auction shall be in accordance with the Bid Procedures and upon notice to all Qualified Bidders who have submitted Qualified Bids.  The Auction will be conducted at the offices of Vinson & Elkins LLP, 666 Fifth Avenue, 26th Floor, New York, New York 10103-0040 on May 2, 2016 at 10:00 a.m. (Eastern Time).

Only representatives or agents of the Debtors, the DIP Agent, the Prepetition Agent, any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases and any Qualified Bidder that has submitted a Qualified Bid (and the legal and financial advisors to each of the foregoing), will be entitled to attend the Auction, and only Qualified Bidders will be entitled to make any subsequent bids at the Auction.

At least two business days prior to the Auction, the Debtors will provide copies of the Qualified Bid or combination of Qualified Bids which the Debtors believe is the highest or otherwise best offer (the "**_Starting Bid_**") to all Qualified Bidders which have informed the Debtors of their intent to participate in the Auction and, if requested, will provide an explanation of how the Starting Bid is valued and a list containing the identification of all Qualified Bidders.

The Debtors may, after consulting with the DIP Agent and the Prepetition Agent, employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (<u>e.g.</u>, the amount of time allotted to make Subsequent Bids (as defined below)) for conducting the Auction, <u>provided</u> that such rules are (i) not inconsistent with the Bid Procedures Order, the Bankruptcy Code, or any other order of the Bankruptcy Court entered in connection herewith and (ii) disclosed to each Qualified Bidder.

Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "***Subsequent Bid***") and (ii) the Debtors determine, in consultation with the DIP Agent and the Prepetition Agent, that such Subsequent Bid or combination of Subsequent Bids is (a) for the first round, a higher or otherwise better offer than the Starting Bid, and (b) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (defined below).  All bids shall be made openly, in the presence of all parties at the Auction.  The Debtors, in their sole discretion (in consultation with the DIP Agent and the Prepetition Agent), may determine appropriate minimum bid increments or requirements for each round of bidding.  In the event of a dispute relating to the conduct of the Auction, such dispute will be heard by the Bankruptcy Court.

For the avoidance of doubt, the Debtors will provide the DIP Agent and the Prepetition Agent with full access to all information related to the Starting Bid and any Subsequent Bid.

After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid or bids that they believe to be the highest or otherwise best offer or combination of offers (the "***Leading Bid***").

A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge and written confirmation of the Leading Bid.

For the purpose of evaluating Subsequent Bids, the Debtors may require a Qualified Bidder submitting a Subsequent Bid to submit, as part of its Subsequent Bid, additional evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, the DIP Agent and the Prepetition Agent in their sole discretion) demonstrating such Qualified Bidder's ability to close the proposed transaction.

If the Debtors receive no more than one Qualified Bid on or prior to the Bid Deadline, the Secured Parties (as defined below) shall notify the Debtors, prior to five (5) days before the Auction, whether they intend to submit a Credit Bid (as defined below) at or prior to the Auction.  If the Secured Parties notify the Debtors that they will not submit a Credit Bid, no Auction shall occur and the Debtors shall seek approval of the only Qualified Bid at the Sale Hearing. If no such notice is provided to the Debtors, the Auction will occur.

**Selection of Successful Bid(s)**.  The Debtors reserve the right, after consulting with the DIP Agent and the Prepetition Agent, to (i) determine in their reasonable discretion which Qualified Bid (or combination thereof) is the highest or otherwise best and (ii) reject at any time prior to entry of a Bankruptcy Court order approving an offer, without liability, any bid or offer that the Debtors in

their reasonable discretion deem to be (x) inadequate or insufficient, (y) not a Qualified Bid or not otherwise in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bid Procedures, or (z) contrary to the best interests of the Debtors and their estates.  If the DIP Agent or the Prepetition Agent does not agree with the Debtors' determinations regarding any of the matters set forth in this paragraph, the Bankruptcy Court shall make such determinations in lieu of the Debtors.

Prior to the conclusion of the Auction, the Debtors will, after consulting with the DIP Agent and the Prepetition Agent: (a) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the transaction; (b) identify the highest or otherwise best offer(s) (the "*Successful Bid*"); (c) determine which Qualified Bid (or combination thereof) is the Successful Bid and which is the next highest or otherwise best offer (the "*Alternate Bid*") for Assets subject to the Auction; and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder(s) (the "*Successful Bidder*"), the amount and other material terms of the Successful Bid and the identity of the party or parties that submitted the Alternate Bid (the "*Alternate Bidder*").  If the DIP Agent or the Prepetition Agent does not agree with the Debtors' determinations regarding any of the matters set forth in this paragraph, the Bankruptcy Court shall make such determinations in lieu of the Debtors.  Within two business days following the completion of the Auction, the Successful Bidder and the applicable Debtors shall complete and execute all agreements, instruments or other documents necessary to consummate the Sale contemplated by the Successful Bid.

The Debtors will sell the Assets for the highest or otherwise best Qualified Bid (or combination thereof) to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the Sale Hearing.  The presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the Qualified Bid.  The Debtors will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

If for any reason, the entity that submits the highest or otherwise best Qualified Bid fails to consummate the purchase of the Assets subject to such bid, or any part thereof, the Debtors and the Alternate Bidder are authorized to effect the sale of such Assets to such Alternate Bidder as soon as is commercially reasonable.  If such failure to consummate the purchase is the result of a breach by the Successful Bidder, the Debtors reserve the right to seek all available remedies from the defaulting Successful Bidder, subject to the terms of the applicable purchase agreement.

**<u>Credit Bid Rights</u>**.  Notwithstanding any other provision of these Bid Procedures or otherwise, the DIP Agent, the DIP Lenders, the Prepetition Agent and the

84605864.1

Prepetition Lender (collectively, the "**Secured Parties**") shall be entitled to credit bid some or all of their indebtedness at the Auction pursuant to section 363(k) of the Bankruptcy Code (a "**Credit Bid**"); *provided however*, that if, upon the DIP Lenders' consent, the Debtors provide a Stalking Horse Bidder with a breakup fee, the Secured Parties' right to Credit Bid is conditioned upon the Secured Parties paying such breakup fee in cash if it is the Successful Bidder; and *provided further*, that if no Qualified Bids are received prior to the Bid Deadline, the Secured Parties must present such Credit Bid to the Debtors no later than five (5) days prior to the date of the Auction. Without limiting the generality of the foregoing and notwithstanding any other provision of these Bid Procedures, the Secured Parties shall not be required to post any deposit to participate in and Credit Bid at the Auction and shall be automatically deemed to constitute "**Qualified Bidders**." In addition, any Credit Bid, whether prior to or at the Auction, shall be deemed to constitute a "**Qualified Bid**." The Secured Parties automatically shall be deemed the Successful Bidder at the Auction if the aggregate amount of their Credit Bid (if any) exceeds the cash consideration of the Leading Bid at the conclusion of the Auction. All rights of the Secured Parties to object to the Debtors' selection of a Successful Bid or Alternate Bid, or to object to the consummation of the sale transaction represented by either such bid, are preserved, including, without limitation, any such rights under section 363(k) of the Bankruptcy Code.

**The Sale Hearing**. If the Debtors do not receive any Qualified Bids, the Debtors will report the same to the Bankruptcy Court at the Sale Hearing. At the Sale Hearing, the Debtors will seek approval of the offer or offers constituting the Successful Bid and, at the Debtors' election, the offer or offers constituting the Alternate Bid.

The Debtors' presentation to the Bankruptcy Court of an offer constituting the Successful Bid and Alternate Bid will not constitute the Debtors' acceptance of either of any such bid, which acceptance will only occur upon approval of such bid by the Bankruptcy Court at the Sale Hearing.

Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale because of (a) failure of a condition precedent beyond the control of either the Debtors or the Successful Bidder upon which occurrence the Debtors have filed a notice with the Bankruptcy Court advising of such failure or (b) a breach or failure to perform on the part of such Successful Bidder upon which occurrence the Debtors have filed a notice with the Bankruptcy Court advising of such breach or failure to perform, then the Alternate Bid will be deemed to be the Successful Bid and the Debtors will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court.

**Reservation of Rights**. The Debtors, with the consent of the DIP Agent and Prepetition Agent, reserve their rights to modify the Bid Procedures or impose, at

or prior to the Auction, additional customary terms and conditions on the sale of the Assets including, without limitation, extending the deadlines set forth in the Bid Procedures, modifying bidding increments, adjourning or canceling the Auction at the Auction and/or adjourning the Sale Hearing, as applicable, in open court without further notice, withdrawing from the Auction any or all of the Assets at any time prior to or during the Auction, or canceling the sale process or Auction, and rejecting all Qualified Bids if warranted in the reasonable exercise of the Debtors' business judgment based upon the facts and circumstances.

### *Ability to Select a Stalking Horse Bidder*

22.     To incentivize potential bidders and thereby maximize the potential value of the Assets, the Debtors request that they be authorized, upon their receipt of any bid (or bids, if for less than substantially all Assets) that the Debtors deem to be acceptable in an exercise of their sound business judgment, to designate one or more Qualified Bids as a stalking horse bid (each, a "***Stalking Horse Bid***") and to execute an Asset Purchase Agreement with such Stalking Horse Bidder in connection with the proposed sale of the Assets, at any time before the commencement of the Auction.  No bid may be a Stalking Horse Bid if it does not constitute a Qualified Bid.

23.     Upon execution of an Asset Purchase Agreement with any Stalking Horse Bidder, such Asset Purchase Agreement will be a Qualified Bid and Leading Bid, and the Debtors will provide notice of such Stalking Horse Bidder and Asset Purchase Agreement as outlined above and in the Bid Procedures.

### *Assignment Procedures*

24.     Additionally, the Debtors, as part of the Sale, may assume and assign Assumed Contracts and Assumed Leases.  The Debtors propose that the following Assignment Procedures govern the assumption and assignment of the Assumed Contracts and Assumed Leases in connection with the Sale of the Assets to the Successful Bidder:

- Not later than two (2) days after the entry of the Bid Procedures Order, the Debtors shall file with the Bankruptcy Court a list identifying the Assumed Contracts and Assumed Leases and the amounts necessary to cure defaults and/or to provide compensation or adequate assurance of

**Page 16 of 28**

compensation for actual pecuniary loss resulting from a default prior to the Petition Date under each of such Assumed Contracts, and Assumed Leases determined by the Debtors (such amounts, "***Cure Payment Liabilities***").

• If the Debtors identify additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned in connection with the Sale not set forth in the original Assumption Notice, the Debtors shall promptly send a supplemental notice to the applicable counterparties to such additional executory contracts and unexpired leases and file the same with the Bankruptcy Court.

• The Debtors shall serve all counterparties to all Assumed Contracts and Assumed Leases with the Assumption Notice, specifically stating that the Debtors are or may be seeking the sale, assumption, and assignment of the Assumed Contracts, and Assumed Leases and notifying such parties of the deadlines for (i) objecting (a "***Cure/Assignment Objection***") to the amount of any Cure Payment Liability related to such Assumed Contracts, which deadline shall be no less than three (3) days prior to the Bid Deadline (the "***Cure/Assignment Objection Deadline***") and (ii) objecting to the ability of the Successful Bidder to provide adequate assurance of future performance of an Assumed Contract or Assumed Lease (an "***Adequate Assurance Objection***"), which deadline shall be no less than two (2) days prior to the Sale Hearing (the "***Adequate Assurance Objection Deadline***" and, together with the Cure/Assignment Objection Deadline, the "***Cure/Adequate Assurance Objection Deadlines***").

• A Cure/Assignment Objection and/or Adequate Assurance Objection must be filed with the Bankruptcy Court and served on the Notice Parties (as defined in the Bid Procedures) so as to be received no later than the applicable Cure/Adequate Assurance Objection Deadline.  Failure to file and serve an objection in accordance with this paragraph (i) will forever bar the non-debtor counterparty from objecting to the Cure Payment Liabilities or provision of adequate assurance of future performance and from asserting any additional cure or other amounts with respect to the Assumed Contracts and Assumed Leases and the Debtors shall be entitled to rely solely upon the Cure Payment Liabilities and (ii) if the Assumed Contract or Assumed Lease was identified as an asset to be purchased pursuant to the Sale, the non-debtor counterparty will be deemed to have consented to the assumption, assignment, transfer, and/or sale of such Assumed Contract and Assumed Lease and will be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder (or any other assignee of the relevant contract, lease or right) that any additional amounts are due or defaults exist, or conditions to assumption, assignment, transfer, and/or sale must be satisfied, under such contract, lease or right.

84605864.1

- If a Cure/Assignment Objection challenges a Cure Payment Liability, the objection must set forth the cure amount being claimed by the objecting party (the "Claimed Cure Amount") with appropriate documentation in support thereof. Upon receipt of a Cure/Assignment Objection, the Successful Bidder (on behalf of the Debtors' estates) may hold an amount equal to the Claimed Cure Amount in reserve pending further order of the Bankruptcy Court or agreement between the Successful Bidder and the objecting party, and the Successful Bidder shall have the right to litigate any dispute the Claimed Cure Amount on behalf of the Debtors' estates. So long as the Successful Bidder holds the Claimed Cure Amount in reserve, the Debtors shall seek authority to assume, assign, transfer, and/or sell the Assumed Contract or Assumed Lease that is the subject of an objection without further delay.

- In cases in which the Debtors are unable to establish that a default exists with respect to any Assumed Contract or Assumed Lease, the relevant Cure Payment Liability shall be set at $0.00 in the Assumption Notice.

25. Unless the applicable agreement provides otherwise, a Qualified Bidder may, from time to time, exclude any Assumed Contract or Assumed Lease in its sole and absolute discretion until the Sale Hearing. The non-debtor party or parties to any such excluded contract or lease will be notified of such exclusion by written notice mailed within three (3) business days of such determination.

*Notice*

26. The Debtors shall serve within two (2) business days (by first class mail, postage prepaid) after entry of the Bid Procedures Order (the "***Mailing Deadline***"), the Sale Notice upon the following parties: (a) the Office of the United States Trustee for the District of Delaware; (b) the applicable state and local taxing authorities; (c) the Internal Revenue Service; (d) the Securities & Exchange Commission; (e) the United States Attorney General/Antitrust Division of Department of Justice; (f) each of the non-Debtor counterparties to the Assumed Contracts and Leases; (g) counsel to the DIP Agent and the Prepetition Agent; and (h) all entities who are known to possess or assert a claim against the Debtors. In addition, on the Mailing Deadline, or

as soon as practicable thereafter, the Debtors shall place the Sale Notice on the website of the Debtors' claims and noticing agent, Garden City Group, LLC.

27.    Within one business day after the conclusion of the Auction, the Debtors will file a notice identifying the Successful Bidder(s) (the "***Notice of Successful Bidder***").

28.    The Debtors submit that the proposed Sale Notice and Notice of Successful Bidder, and providing notice of this Motion, the Auction and the Sale Hearing as described herein, complies fully with Bankruptcy Rule 2002 and the Local Rules and constitutes good and adequate notice of the Sale and the proceedings with respect thereto.  Therefore, the Debtors respectfully request that this Bankruptcy Court approve the form of the Sale Notice and the notice procedures proposed above.

## BASIS FOR RELIEF

**A.    The Bid Procedures Are Fair, Appropriate and Are Designed to Maximize the Value Received for the Assets**

29.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  The Debtors submit that the Bid Procedures are appropriate, consistent with procedures routinely approved by courts in this district, ensure that the Bidding Process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bid Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.   The Bid Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.  Thus, the Debtors and all parties in interest can be assured that the consideration for the Assets will be fair and reasonable.  At the same time, the Bid Procedures provide the

Debtors with an adequate opportunity to consider all competing offers and to select, in their reasonable business judgment, and with reasonable consultation with their pre- and post-petition lenders and any creditors' committee appointed in these cases, the highest and best offer(s) for the Assets.  Accordingly, the Debtors submit that the Bankruptcy Court should approve the Bid Procedures.

**B.      Approval of the Entry into an Asset Purchase Agreement and the Provision of Bid Protections**

30.      To the extent the Debtors enter into an Asset Purchase Agreement with a Stalking Horse Bidder prior to the commencement of the Auction, it is appropriate to provide the Stalking Horse Bidder with the proposed Bid Protections.  The proposed Bid Protections are appropriate in these cases because the Debtors will only enter into an Asset Purchase Agreement with a Stalking Horse Bidder if they believe it will maximize the ultimate sale price for the Assets. Moreover, the Debtors intend to negotiate any Asset Purchase Agreement at arms' length and in good faith.  Thus, the authorization for the Debtors to provide the Bid Protections to a Stalking Horse Bidder is justified, if entering into an Asset Purchase Agreement allows the Debtors to maximize the potential sale value of the Assets at the Auction.

31.      Courts have recognized that fees may be used to protect bidders in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code and that such fees can be "important tools to encourage bidding and to maximize the value of the Debtors' assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  Such protections enable a debtor to assure a sale to a contractually-committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity of obtaining even greater benefits for the estate through an auction process. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R.

24, 28 (Bankr. S.D.N.Y. 1989) (stating that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted).

32.    This Bankruptcy Court has approved protections similar to the proposed Bid Protections as reasonable and consistent with the type and range of Bid Protections typically approved. *See, e.g., In re Cal Dive Int'l, Inc.*, No. 15-10458 (CSS) (Bankr. D. Del. July 7, 2015) [D.I. 572] (authorizing expense reimbursement); *In re Old FOH Inc. (f/k/a/ Frederick's of Hollywood, Inc.)*, No. 15-10836 (KG) (May 6, 2015) [D.I. 120] (authorizing a termination fee and expense reimbursement); *In re Caché Inc.*, No. 15-10172 (MFW) (Bankr. D. Del. Feb. 25, 2015) [D.I. 196] (authorizing expense reimbursement and break-up fee); *In re Deb Stores Holding LLC*, No. 14-12676 (KG) (Bankr. D. Del. Dec. 18, 2014) [D.I. 159] (same); *In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del. July 1, 2014) [D.I. 160] (authorizing expense reimbursement); *In re Coldwater Creek, Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. Apr. 29, 2014) [D.I. 266] (approving expense reimbursement and break-up fee); *In re Brookstone Holdings Corp.*, No. 14-10752 (BLS) (Bankr. D. Del. Apr. 25, 2014) [D.I. 241] (same); *In re LMI Legacy Holdings Inc. (fdba Landauer Healthcare Holdings)*, No. 13-12098 (CSS) (Bankr. D. Del. Sept. 12, 2013) [D.I. 143] (same).

**C.    Approval of the Sale is Warranted Under Section 363 of the Bankruptcy Code**

33.    Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g., In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Institutional Creditors of Cont'l Air Lines, Inc. v. Confl Air Lines,*

84605864.1

*Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).

34.    Courts typically consider the following factors in determining whether a proposed sale meets this standard:

> (a)    whether a sound business justification exists for the sale;
>
> (b)    whether adequate and reasonable notice of the sale was given to interested parties;
>
> (c)    whether the sale will produce a fair and reasonable price for the property; and
>
> (d)    whether the parties have acted in good faith.

*In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

35.    The Debtors possess ample and sound business reasons for selling the Assets at this time.  As discussed above, the Debtors have determined that the comprehensive sale process will maximize the return to their creditors.  Furthermore, the administrative and economic costs of maintaining such assets for an uncertain period of time would not be in the best interest of the estates.  The Sale (in whatever form that ultimately results) represents the highest and best use for the Debtors' assets.  Under these circumstances, sound business reasons exist that justify the sale of the Assets outside of the ordinary course of business.

36.    The Debtors also meet the additional requirements necessary to approve a sale under section 363 of the Bankruptcy Code.  As stated herein, the Debtors will provide adequate notice of the Sale to interested parties, and the Debtors submit that the aforementioned notice procedures are reasonable and adequate under the circumstances.  In addition, the Debtors will continue to market the Assets up until the Bid Deadline in order to maximize the number of participants who may participate as buyer at the Auction.  Accordingly, the Debtors are confident

84605864.1

that their sale process will maximize the value to be achieved from the Sale and that the sale

price is fair and reasonable.

**D.      The Proposed Sale Transaction Satisfies the Requirements of Bankruptcy Code
         Section 363(f) for a Sale Free and Clear**

37.      The Debtors request approval to sell the Assets free and clear of any and all liens,

claims, interests and encumbrances (except for any assumed liabilities) in accordance with

section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor in possession may

sell estate property "free and clear of any interest in such property of an entity other than the

estate" if any one of the following conditions is satisfied:

> (a)     applicable nonbankruptcy law permits sale of such property free
>         and clear of such interest;
>
> (b)     such entity consents;
>
> (c)     such interest is a lien and the price at which such property is to be
>         sold is greater than the aggregate value of all liens on such
>         property;
>
> (d)     such interest is in bona fide dispute; or
>
> (e)     such entity could be compelled, in a legal or equitable proceeding,
>         to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343,

345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may

approve a "free and clear" sale even if only one of the subsections is met).

38.      Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which

provides that "[t]he Court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a); see *In re*

*Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo*

*White Truck Corp. v. Chambersburg Beverage Inc. (In re White Motor Credit Corp.)*, 75 B.R.

944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

39.    The Debtors submit that the Sale will satisfy the requirements of section 363(f) of the Bankruptcy Code.  To the extent a party objects to Sale on the basis that it does hold a lien or encumbrance on the Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims or that such lien is in *bona fide* dispute.  In addition, to the extent the Debtors discover any party may hold a lien on all, or a portion of, the Assets, the Debtors will provide such party with notice of, and an opportunity to object to, the Sale.  Absent objection, each such party will be deemed to have consented to the sale of the Assets.

40.    Accordingly, the Debtors believe that the Sale (i) will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and (ii) should be approved free and clear of all liens, claims, interests and encumbrances.

**E.    A Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m)**

41.    Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *Mark Bell Furniture Warehouse, Inc., v. D. M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); *Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

42.    Any agreement consummating a Sale will be negotiated at arm's-length by sophisticated parties, each represented by their own advisors. Accordingly, the Debtors request that the Sale Order include a provision that the Successful Bidder for the Assets, is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m). The Debtors believe that

providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the same will occur promptly.

**F.     Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized**

43.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985); *see also In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice).

44.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing*, 762 F.2d at 1311.  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default.  11 U.S.C. 365(b)(1).

45.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  *See In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate.").

46.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract … only if the trustee assumes such contract … and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").

47.     The Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Assumed Contracts and Assumed Leases in connection with the Sale.  The Debtors further request that the Sale Order provide that the Assumed Contracts and Assumed Leases will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder notwithstanding any provisions in the Assumed Contracts and Assumed Leases, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (f)(3) that prohibit such assignment.

48.     To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial credibility, willingness and ability of the Successful Bidder to perform under the Assumed Contracts and Assumed Leases.  The Sale Hearing will afford the Bankruptcy Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts and Assumed

84605864.1

Leases, as required under Bankruptcy Code section 365(b)(1)(C).  Further, as set forth above, the Debtors will give notice to all parties to the Assumed Contracts and Assumed Leases, which notice will include the amounts the Debtors believe are necessary to cure any defaults in accordance with section 365(b) of the Bankruptcy Code.  Accordingly, the Debtors submit that implementation of the proposed Assignment Procedures is appropriate in these cases.

## NOTICE

49.    Notice of this Motion has been provided by delivery to: [(a) the Office of the United States Trustee for the District of Delaware; (b) counsel to Beal Bank, as prepetition lender; (c) the Debtors' 20 largest unsecured creditors (on a consolidated basis); (d) those persons who have formally appeared in the Cases and requested service pursuant to Bankruptcy Rule 2002; (e) the United States Securities and Exchange Commission; (f) the Internal Revenue Service; and (g) any parties entitled to notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested in this Motion, the Debtors submit that no further notice is necessary.

## NO PRIOR REQUEST

50.    No prior request for the relief sought herein has been made to this Bankruptcy Court or any other court.

84605864.1

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court (i) enter the Bid Procedures Order, in substantially the form attached hereto as **Exhibit A**, (ii) grant the other relief requested herein pending a Sale; (iii) enter the Sale Order, in substantially the form attached hereto and **Exhibit D** and (iv) grant such other and further relief to the Debtors as the Bankruptcy Court may deem proper.

Dated: February 11, 2016
Wilmington, DE                                        Respectfully submitted,

                                                     **DRINKER BIDDLE & REATH LLP**

                                                     */s/ Steven K. Kortanek*
                                                     Steven K. Kortanek (DE 3106)
                                                     Howard A. Cohen (DE 4082)
                                                     222 Delaware Avenue, Suite 1400
                                                     Wilmington, DE 19801
                                                     Tel:  (302) 467-4200
                                                     Fax: (302) 467-4201
                                                     Steven.Kortanek@dbr.com
                                                     Howard.Cohen@dbr.com

                                                     -and-

                                                     **VINSON & ELKINS LLP**
                                                     David S. Meyer (NY 4576344)
                                                     Jessica C. Peet (NY 5265913)
                                                     Lauren R. Kanzer (NY 5216635)
                                                     666 Fifth Avenue, 26th Floor
                                                     New York, NY 10103-0040
                                                     Tel:  (212) 237-0000
                                                     Fax: (212) 237-0100
                                                     dmeyer@velaw.com
                                                     jpeet@velaw.com
                                                     lkanzer@velaw.com

                                                     Paul E. Heath (TX 09355050)
                                                     Reese A. O'Connor (TX 24092910)
                                                     Trammell Crow Center
                                                     2001 Ross Avenue, Suite 3700
                                                     Dallas, TX 75201
                                                     Tel:  (214) 220-7700
                                                     Fax: (214) 220-7716
                                                     pheath@velaw.com
                                                     roconnor@velaw.com

                                                     **PROPOSED ATTORNEYS FOR THE DEBTORS**