IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Case No. 16-10369 (KJC) |
| | ) | |
| Sundevil Power Holdings, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| | ) | |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

Hrg. Date: 3/3/16 @ 10:00a.m.
Obj. Date: 2/26/16 @ 4:00p.m.

**RESPONSE OF TUCSON ELECTRIC POWER COMPANY
AND UNS ELECTRIC, INC. TO DEBTORS' MOTION FOR
ENTRY OF ORDERS (I) ESTABLISHING BIDDING AND
SALE PROCEDURES; (II) APPROVING THE SALE OF
ASSETS; AND (III) GRANTING RELATED RELIEF**

Tucson Electric Power Company ("**TEP**") and UNS Electric, Inc. ("**UNSE**") (TEP and UNS are collectively hereinafter referred to as "**TEP/UNSE**"), the owners of Power Block III at the Gila River Power Station ("**GRPS**") and tenants-in-common of a twenty-five (25%) undivided interest in the Common Facilities at GPRS, as parties in interest in the above-captioned Chapter 11 bankruptcy proceeding ("**Bankruptcy Case**"), hereby file this "Response of Tucson Electric Power Company and UNS Electric, Inc. to Debtors' Motion for Entry of Orders (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief" (the "**Response**") and in support respectfully state as follows:

**I.  TEP/UNSE HAVE A VESTED INTEREST IN THE PROCEDURES GOVERNING THE SALE OF DEBTORS' ASSETS AND POSSIBLE ASSIGNMENT OF RELATED CONTRACTS.**

**A.  Complexity of the GRPS Ownership and Operational Structure**

---

[1] The Debtors in these chapter 11 cases, and their respective federal tax identification numbers, are Sundevil Power Holdings, LLC (2308) and SPH Holdco LLC (7777). The Debtors' service address is: 701 Lake Street E, Suite 300, Wayzata, Minnesota 55391.

{1950005;21;v1 }

1.      Something as simple as establishing bid procedures becomes complicated when considering the complex nature of GRPS's overall plant structure.[2] In their motion, the Debtors propose to sell assets that do not operate in isolation but through a management structure built on a myriad of interwoven agreements and subsequent delegations of contractual rights, duties, and responsibilities.  Federal and state regulation and oversight inherent to the nature of Debtors' business further burdens the Debtors' assets.  While the Debtors do not seek to hide this in their motion, TEP/UNSE is obligated at this point to insist that any approved bidding and sales procedures should accurately disclose and account for this complexity.

2.      As is freely and clearly indicated in the "Declaration of Raphael T. Wallender in Support of Chapter 11 Petitions and First Day Pleadings" (the "**Wallender Declaration**"), the Common Facilities at the GRPS, such as evaporation ponds, transmission lines, natural gas pipelines, groundwater wells, and office space, are owned as undivided tenant-in-common interests.  Due in large part to this tenant-in-common ownership relationship, the GRPS Power Block owners entered into numerous ownership, management, operations, and maintenance agreements, to establish the rights and responsibilities of each of the individual ownership parties with regard to the common facilities, common property and shared property.  The GRPS owners further entered into several addendums, sub-agreements and ancillary agreements that further delegated these contractual responsibilities to various counterparties, including Gila Bend Operations Co., LLC ("**GBOC**"), Ethos Energy Power Plan Services ("**Ethos**"), and Entegra Power Services, LLC ("**Entegra**").

3.      Without a doubt, the day-to-day operation of the GRPS facility is dependent upon a multi-layered ownership structure that is comprised of many agreements between the Debtor, TEP/UNSE, and the other non-transferring owner, Gila River Power Company, LLC ("**GRP**"). In their Motion, the Debtors propose to establish a procedure to market and sell assets that are

---

[2]     GRPS contains four separate power blocks and Common Facilities that collectively serve all four power blocks.  Power Blocks I and II are owned by the Debtors.  Power Block III is co-owned by TEP and UNSE.  Power Block IV is owned by Gila River Power Company, LLC.  The Common Facilities are co-owned by all Power block owners as tenants-in-common in 25% shares based upon the number of Power Blocks owned.

both a part of and burdened by this complex structure. The intended sale of these assets, and the coinciding bidding requirements and procedures, cannot be considered in isolation. Rather, the disclosures to third parties and the procedures governing this process should accurately reflect both the ownership and management structure that governs the Debtors' assets and the non-transferring owners' operational and economic interest in the common facilities and the GRPS as a whole.

B.     **Management and Ownership of GRPS.**

4.     TEP/UNSE and Gila Bend Operations Co., LLC ("**GBOC**") entered into an Operations & Maintenance Agreement, dated December 14, 2014, as amended, pursuant to which GBOC will operate and maintain TEP/UNSE's interests in the Common Facilities and Power Block III for TEP/UNSE (the "**TEP/UNSE O&M Agreement**").

5.     Debtors and GBOC entered into an Operations & Maintenance Agreement dated March 1, 2012, as amended, pursuant to which GBOC operates and maintains Sundevil's interests in the Common Facilities and Power Blocks I and II for Sundevil (the "**Sundevil O&M Agreement**").

6.     GRP and GBOC entered into an Operations & Maintenance Agreement dated December 14, 2014, as amended, pursuant to which GBOC operates and maintains GRP's interests in the Common Facilities and Power Block IV (the "**GRP O&M Agreement**") (the TEP/UNSE O&M Agreement, the Sundevil O&M Agreement and the GRP O&M Agreement are referred to collectively as the "**O&M Agreements**").

7.     Thus, pursuant to the O&M Agreements, GBOC is the entity designated to operate and maintain the GRPS Common Facilities and to make decisions regarding the Common Facilities, budgeting, and other common ownership matters, and has delegated all of those duties to Ethos.

8.     By virtue of separate delegation addendums to each of the O&M Agreements, GBOC has in turn delegated to Ethos all of GBOC's duties and obligations under the O&M

Agreements.

9. The Operating Agreements expire as of April 16, 2016, unless extended for an additional one (1) year term upon mutual agreement of the respective Owners. The Operating Agreements have not been extended as of the Petition Date.

10. In connection with TEP/UNSE's purchase of Power Block III, TEP/UNSE, GRP, and the Debtors (collectively, the "**Owners**") entered into a Second Amended and Restated Ownership Agreement (the "**Ownership Agreement**") dated December 10, 2014.

11. The Ownership Agreement sets forth the terms and conditions of the Owners' respective undivided ownership interests in the "Common Facilities," Common Facilities Property," and Shared Property" (as defined therein) (collectively the "**Common Facilities**") of the GRPS. Specifically, the Ownership Agreement provides the following:

    a. Debtors own a one-hundred percent (100%) fee interest in Power Blocks I and II, a fifty percent (50%) undivided interest in the Common Facilities, and a fifty percent (50%) limited liability company interest in GBOC.

    b. TEP owns a seventy-five percent (75%) fee interest in Power Block III and UNSE owns a twenty-five percent (25%) fee interest in Power Block III, and both TEP and UNSE co-own a twenty-five percent (25%) undivided interest in the Common Facilities and a twenty-five percent (25%) limited liability company interest in GBOC.

    c. GRP owns a one-hundred percent (100%) fee interest in Power Block IV, a twenty-five percent (25%) undivided interest in the Common Facilities and a twenty-five percent (25%) limited liability company interest in GBOC.

12. The Ownership Agreement establishes an "Owner Committee" pursuant to which contracts and matters related to the Common Facilities are administered and generally managed by unanimous vote of the owner representatives, including the annual operating plan, management and administration of the O&M Agreements. The Ownership Agreement requires the unanimous consent of the Power Block owners for most decisions.

13. Specifically, any transfer of the Debtors' ownership interest in Power Blocks I and II of GRPS is governed by Article 8.1 of the Ownership Agreement, and is subject to the

vote of TEP, UNSE and GRP.

14. Under Article 8.1(b) of the Ownership Agreement, in relevant part, the Debtors are prohibited from transferring their ownership interest unless: (i) the Debtors provide evidence, to the reasonable satisfaction of the non-transferring owners that the proposed transferee is financially capable, or provides reasonable financial assurances or guarantees, of fulfilling its obligations under any relevant agreements; (ii) all requisite regulatory approvals for the transfer have been obtained, and such approvals do not contain conditions that would reasonably be expected to materially and adversely affect the ownership or operation of the non-transferring owners; and (iii) the Debtors and their transferee execute and deliver to the other non-transferring owners an assignment agreement and any other documents and instruments as the non-transferring owners reasonably require, to confirm the Debtors' continuing obligation for all liabilities incurred by it under any relevant agreements and the proposed transferee's execution of a counterpart of each of the any relevant agreements and an acknowledgment that it is assuming all of the Debtors' obligations under the any relevant agreements.[3]

15. Because of the ownership and operation structure of GRPS, and the terms and conditions of the current owners' respective undivided ownership interests as set forth in the Ownership Agreement and O&M Agreements, any transfer of the Debtors' Assets must comply with the Ownership Agreement because of the significant impact on the owners like TEP/UNSE.

16. Indeed, any procedures established for the purpose of selling Debtors' assets must comply with the process as set forth in the Ownership Agreement and O&M Agreements and protect the rights of TEP/UNSE as tenants-in-common of GRPS, members of the GBOC, and party to the Ownership Agreement.

**C.   Any Sale is Further Conditioned on FERC Approval.**

17. Aside from the restrictions and obligations imposed by the Ownership Agreement, any sale of the Debtors' assets is subject to approval of the Federal Energy

---

[3] A true and correct copy of Appendix N to the Ownership Agreement effectuating any or all ownership transfers ("Assignment Agreement") pursuant to Article 8.1 is attached hereto as **Exhibit 1**.

Regulatory Commission (the "**FERC**") pursuant to Section 203 of the Federal Power Act, 16 U.S.C. § 824(b) (the "**FPA**").

18. FERC exercises jurisdiction over all facilities involved in the transmission or sale of electric energy in interstate commerce, of which any future purchaser of Debtors' assets necessarily will need to qualify. 16 U.S.C. §§ 824(b), 824b(a).

19. The Debtors' proposed Bid Procedures only briefly mention that a bid must provide evidence satisfactory to the Debtors of the bidder's ability to obtain necessary "regulatory approvals."

20. Under Section 203 of the FPA, FERC must authorize any purchase or acquisition of an existing generation facility by a public utility or holding company in a holding company system that includes a transmitting utility or an electric utility subject to its jurisdiction. 16 U.S.C. § 824b(a).

21. Section 203 of the FPA additionally provides that FERC shall approve such a disposition or change of control of assets if it finds that it "will be consistent with the public interest." 16 U.S.C. § 824b(a).

22. TEP/UNSE respectfully submit that the Bid Procedures must ensure that any potential acquiror of the Debtors' assets (even to become recognized as a Qualified Bidder) must demonstrate the ability to satisfy FERC's requirements to be approved as an owner-operator. Court approval of a sale to an entity which ultimately proves unable to satisfy the FERC requirements will prove to be nothing more than a waste of time, money, judicial resources and will likely negatively impact TEP/UNSE's interest in GRPS, as well as the interest of the other non-transferring owners.

E. **Critical Timing Issues Regarding O&M Agreements and other Agreements.**

23. As stated above, TEP/UNSE, GRP, and the Debtors are all party to their own individual, and virtually identical Operations and Maintenance Agreements (previously and hereinafter, the "**O&M Agreements**") with GBOC.

24.     These O&M Agreements between the Owners and GBOC allow GBOC to be the legal operator of GRPS and the formal holder of all necessary permits.  These O&M Agreements allow GBOC to oversee operation and maintenance of all four (4) power blocks and common facilities – as well as purchasing and managing inventories, maintaining environmental compliance programs and operating permits.

25.     The current O&M Agreements are set to expire on April 16, 2016, but under the procedures set forth in the Motion, bids are due on April 29, 2016 -- thirteen days after the O&M Agreements are set to terminate.  The Debtors' Bid Procedures fail to address the significant impact of the expiration of the O&M Agreements that will occur prior to the submission of bids unless the O&M Agreements are extended by mutual agreement of the Owners.

26.     TEP/UNSE and GRP need an affirmative representation from the Debtors regarding their intentions to enter into an extension of the O&M Agreements and inclusion of revisions to the scope of work for North American Electric Reliability Corporation ("**NERC**") responsibilities.  More importantly, prospective bidders need a definitive answer as to the status of the O&M Agreements, NERC compliance, cash management and procurement duties, and other common facility management services so that GRPS can operate in compliance in its entirety and as part of any due diligence process.

27.     If the Debtors allow their O&M Agreement to expire, and fail to address other management services and NERC compliance requirements because of the interconnected nature of the current ownership and management structure of the GRPS, the overall operation and maintenance of the facility will be at risk.

28.     The current uncertainty and concern over the status of the O&M Agreements create other operational issues that are of critical importance to TEP/UNSE and any potential buyer.

29.     For example, as indicated above, the owners of the plant have various regulatory compliance obligations including compliance with all NERC standards and regulations.

30.     NERC is the electric reliability organization certified by the FERC to establish

and enforce reliability standards for the bulk power system.

31. Effective December 10, 2014, all owners of the GRPS entered into the NERC Delegation Agreement, which established the roles and responsibilities regarding compliance with NERC reliability standards at GRPS and set forth a process for identifying on an annual basis certain NERC reliability standards to be performed by either Entegra and/or Ethos. In general, Ethos performs the day-to-day compliance of certain reliability standards, while Entegra is responsible for compliance oversight.

32. Prior to the Petition Date, Entegra indicated its intention to TEP/UNSE, GRP and the Debtors to terminate its compliance obligations, and the parties were in negotiations to amend the NERC compliance oversight responsibilities between TEP/UNSE, Debtors, GRP, Ethos and Entegra.

33. NERC compliance is intricately intertwined with the operation and ownership of the GRPS and Power Blocks, such that any transfer of the Debtors' assets significantly affect the interests of TEP, UNSE, GRP, Ethos, Entegra, GBOC and the GRPS as a whole.

34. At present, the owners are working to revise the Delegation Agreement to address various operational issues, but these NERC compliance and delegation issues need to be resolved very soon for the owners to be in a position to meet the September deadline for NERC compliance certification. Critically, the current owners do not have the luxury of waiting until the Debtors' complete their sale.

## II. NUMEROUS ASPECTS OF THE PROPOSED BIDDING AND SALE PROCEDURES REQUIRE CLARIFICATION AND/OR MODIFICATION

### A. FERC Requirements Must be Clearly Disclosed

35. TEP/UNSE does not for one instant believe that any party seeking to become a Qualified Bidder will be unaware of FERC approval requirements at some point in this process. Yet the complete silence (except for a vague reference to "regulatory approvals" in the proposed Bid Procedures) completely ignores the elephant in the room. Simply put, as currently written,

the Bid Procedures do not accurately reflect the necessity, and true extent, of the FERC approval process.

36.     TEP/UNSE further acknowledges that this Court likely has the ability to approve a potential sale that may be later subject to further FERC approval.  However, since TEP/UNSE is significantly impacted by day-to-day management and economic issues involving any such potential purchase and FERC approval process, the definition of a Qualified Bidder must address, at some basic level, the potential ability or likelihood of such ultimate approval. Otherwise, the Debtors, this Court and all parties in interest may be doomed to participate in this time consuming, expensive, and possibly quixotic exercise.

### B.     Bids Addressing Some or All of Debtors' Assets

37.     The Bid Procedures contemplate a Qualified Bid by a Qualified Bidder that may include some or all of the Debtors' Assets.  While it may be possible to sell Debtors' two Power Blocks to two different buyers, this possibility creates inherent issues as they relate to separating the common ownership and numerous agreements essential to the operation of the GRPS.  The asset transfer should be limited to the entire power block, including the respective share of the Common Facilities, Common Property, and Shared Property.  GRPS site and structure could accommodate different co-owners for Power Blocks I and II.

38.     While the Debtors may argue that such analysis will necessarily be included in the decision to determine Qualified Bid status, an ounce of prevention is worth a pound of cure. TEP/UNSE submits that the Bid Procedures should make structural issues like this one clear to all potential bidders and other parties in interest. The less ambiguity the less likelihood of confusion, delay, and possible contests.

### C.     Vagaries of Contract/Lease Assignment and Assumption Requirements

39.     The Motion's proposed procedures for assumption and assignment of contracts (although generally acceptable as common practice for sale motions) similarly fails to disclose, address and incorporate into the Qualified Bid process the necessarily interconnected nature of Power Block ownership and related operation.

40. Although TEP/UNSE has not yet had an opportunity to go through all the possible permutations of possible combinations, all parties would agree that purchasing either Power Block I or II (or both) without assuming any of the related contracts and obligations is unacceptable on its face. The Debtors should be required to reach a conclusion in consultation with TEP/UNSE as to whether <u>any</u> contracts are to be rejected prior to soliciting bids. That analysis, if done, should be disclosed as part of the Bid Procedure. Further, the Bid Procedures need to specifically identify the unconventional role of GBOC as a special purpose entity operator in the GRPS operations and multiplicity of contract documentation that is currently in the process of being negotiated.

### D.    **Transparency of Auction Process**

41. As a part owner of the GRPS as well as an active member of GBOC, involved in both day-to-day management as well as payment of related expenses, TEP/UNSE should be allowed to be present at any auction for the assets comprising the Debtors' business. All Owners are active members of GBOC, and are involved in the day-to-day management of the GRPS, and therefore should be allowed, among other things: (i) access to the Data Room, (ii) the right to review and approve any and all contracts to be assumed, (iii) the right to be listed on and propose names for the Interested Party list or Potential Bidder list, (iv) the right to be present at the auction (if any), and (v) the right to review and approve the financial capability of any Potential Bidder. TEP/UNSE is sensitive to the Debtors' desire to maintain control over the actual auction process, and that begins in large part in controlling the number of participants allowed into the room. TEP/UNSE has not yet decided whether or not to seek to become a Qualified Bidder or to seek to submit a Qualified Bid. However, the transparency of the sale process of Power Blocks I and/or II, as well as the potential assumption and assignment of myriad related contracts/leases, strongly argues in favor of the existing non-debtor owners being a full participant and have superior rights in the entire auction process, including the Due Diligence process leading up to the auction itself. Without question, TEP/UNSE would be subject to all the same non-disclosure and confidentiality restrictions that any other potential or Qualified Bidder would be expected to

maintain.

42.     The Bid Procedures should include, among other things: (i) the form of proposed purchase agreement and all required exhibits, as reviewed and approved by the Owners; (ii) the complete list by purpose, counterparty and effective date of the existing contracts to be potentially assumed or assigned by the Qualified Bidder, as reviewed and approved by the Owners; (iii) submission of the financial statements and financing commitment of the Qualified Bidder to the Owners for review and approval; (iv) modification and consolidation of the duplicate Management Services Agreements so that the Owners can comply with upcoming critical NERC reliability compliance deadlines which must be submitted on behalf of the Gila River Power Station as a whole; (v) modifications to or extension of the O&M Agreements, as reviewed and approved by the Owners, to ensure continuity of operations and maintenance at the Gila River Power Station; and (vi) review and approval by the Owners of the transfer of Debtors' interest in GBOC.

## III. <u>CONCLUSION</u>

In light of the foregoing, TEP/UNSE respectfully requests that the Court require the Debtors to (a) include additional disclosures to any and all potential bidders (as well as parties-in-interest to the case) regarding, among other things, (i) the need for FERC approval, (ii) the risks associated with bids for less than 100% of the Debtors' assets, and (iii) the risks associated bids which may seek to assume some, but not all, of the interrelated contracts and leases, (b) include all GRPS Owners in the Due Diligence and auction phase of the sale process, and (c) to allow Debtors and GRPS Owners to finalize mutually agreeable joint documentation relative to the NERC Compliance, cash management and procurement services, and all necessary extension of the Operating Agreements with Ethos, Gila River Power LLC so that the GRPS and plant operations are not in jeopardy during the bid process .

DATED:      February 26, 2016            ASHBY & GEDDES, P.A.

*/s/ William P. Bowden*
William P. Bowden
500 Delaware Ave.
PO Box 1150
Wilmington, DE 19899
Telephone:    302-654-1888
Facsimile:    302-654-2067
Email:        wbowden@ashby-geddes.com

and

SNELL & WILMER L.L.P.
Christopher H. Bayley
J. Matthew Derstine
400 E. Van Buren St., Ste. 1900
Phoenix, AZ 85004-2202
Telephone:    602-382-6000
Facsimile:    602-382-6070
Email         cbayley@swlaw.com
              mderstine@swlaw.com

Attorneys for Tucson Electric Power Company and UNS Electric, Inc.