## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Sundevil Power Holdings, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 16-10369 (KJC)<br><br>Chapter 11<br><br>(Jointly Administered)<br><br>**Hearing Date:  March 3, 2016, at 10:00 a.m.**<br>**Related Docket Nos. 17, 53, 61, 64 and 65** |

### DEBTORS' REPLY IN SUPPORT OF THE BID PROCEDURES REQUEST SET FORTH IN DEBTORS' MOTION FOR ENTRY OF ORDERS (I) ESTABLISHING BIDDING AND SALE PROCEDURES (II) APPROVING THE SALE OF ASSETS AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***"), by and through their proposed undersigned counsel, hereby file this Reply (the "***Reply***") in support of the approval of bidding and auction procedures (the "***Bid Procedures Request***") sought in the Debtors' Motion for Entry of Orders (i) Establishing Bidding and Sale Procedures (ii) Approving the Sale of Assets and (iii) Granting Related Relief (the "***Sale Motion,***" Docket No. 17), and respectfully state as follows:

### I.        PRELIMINARY STATEMENT

1.        The Debtors have proposed responsible bidding procedures designed to maximize the value of their assets, though an open, agnostic process that can accommodate all options, be it an equity transaction or one or more asset transactions.  The proposed procedures have been improved since the original proposed procedures filed with the Sale Motion, as a result of comments from the U.S. Trustee, many of which the Debtors have accepted, as well as

---

1 The Debtors in these chapter 11 cases, and the last four digits of their respective federal tax identification numbers, are Sundevil Power Holdings, LLC (2308) and SPH Holdco LLC (7777).  The Debtors' service address is:  701 East Lake Street, Suite 300, Wayzata, Minnesota 55391.

comments from the DIP Lenders. The Debtors note that the discussions with the U.S. Trustee have been fruitful in many respects, and the Debtors will continue to work with the U.S. Trustee to resolve or narrow the remaining open issues.

2.      Fundamentally, the Debtors are proposing a process that is over two months in duration between bid procedures approval and the auction, leading to an auction on May 4, 2016 and a sale hearing the following week.  If, in the early stages of the process, a party can satisfy the rigorous test required to earn bidder protections and to serve in a stalking horse bidder capacity, the Debtors also seek the flexibility to award reasonable stalking horse protections to such a party, in order to further maximize value in their sale process.

3.      Apart from the informal responses and collaboration on the proposed procedures, four responses to the Bid Procedures Request have been filed to date. One response, from the Debtors' property taxing authority, is easily addressed as it is a sale objection seeking to preserve rights.  The second objection is unfortunately one filed by prospective bidders which appears designed to chill bidding and to harm case stakeholders' ability to achieve maximum value.  The latter response, filed by the co-owners of one of the Debtors' two adjoining power blocks, TEP/UNSE,[2] has as its predominant feature serious mischaracterizations of the relevant agreements that comprise the rights of the Debtors, TEP/UNSE, and other parties who own and operate the Gila River Power Station (the "***GRPS***") facilities.

4.      The false contentions in the TEP/UNSE Response must be cleansed in order to maintain the integrity of the Debtors' M&A process. The Debtors' chief concern is that the TEP/UNSE response will harm the Debtors' process by creating a false sense of barriers to entry, when in fact the supposed barriers to entry either do not exist or have been significantly exaggerated by these potential bidders.

---

2 "***TEP/UNSE***" refers to Tucson Electric Power Company ("***TEP***") and UNS Electric, Inc. ("***UNSE***").

5.      As always, any party interested in the opportunity to acquire the Debtors' assets should focus solely on the fundamentals of diligence, and indeed the Debtors' data room is the definitive source of correct and complete documentation of the M&A opportunity being marketed by the Debtors. Due to the assertions made in the TEP/UNSE response, the Debtors are nonetheless required to set the record straight.

6.      The U.S. Trustee has filed an objection that takes a "glass half empty" view of what are among the most open bid procedures possible.  In fact, the wide open nature of the Debtors' process is very close to a model of what a market test should be - one with as few barriers to entry as possible.  The U.S. Trustee appears to miss the benefit of having a pure market process, by complaining that the process "includes almost no information regarding the terms of the sale - no sale price or price floor, no form of asset purchase agreement ("APA"), and no identification of a stalking horse or other potential buyer."  One of these contentions is incorrect - although a model APA has yet to be filed, the Debtors commit to filing a model or proposed form of APA at the outset of the marketing process beginning after the bid procedures hearing. Ironically, the balance of the U.S. Trustee's concerns are misplaced complaints about having an unusually open (in chapter 11 or otherwise), free market process.  For example, a reserve price, as the U.S. Trustee seems to seek, is essentially an argument by the U.S. Trustee to add a new barrier to entry to the Debtors' marketing process.

7.      With respect to the U.S. Trustee's concerns about pre-approval of stalking horse bidder protections, the Debtors recognize that a further procedure is warranted with respect to approval of any actual proposed stalking horse. As such, the Debtors intend to propose a modified form of bidding procedures order, consistent with the proposed revised version attached as Exhibit "A" hereto (which remains subject to review and further revisions), which

would include a streamlined procedure to seek approval of a stalking horse with appropriate

bidder protections. These and the other issues raised by the U.S. Trustee are discussed further

below.

8.      Finally, a limited objection was filed by Nevada Power Company d/b/a NV

Energy, raising a concern that regulatory approvals for a buyer may take longer than the current

proposed outside closing date of July 7, 2016.  The Debtors certainly appreciate the concern

raised by NV Energy, and are optimistic that a value-maximizing balance can be achieved

insofar as the proposed July deadline is concerned. Significant care and thought needs to be

given to ensure that the costs of the Debtors' process are managed, and that the risks of any

additional costs are allocated in a reasonable and responsible manner. In short, a productive

dialogue is well underway on the timing issues raised by NV Energy, and the Debtors hope that

these concerns can be met promptly.

## II.      REPLY

### A.      The TEP/UNSE Response Contains No Less Than Five False Statements and Material Omissions

9.      Inexplicably, TEP and UNSE have not accurately set forth the material provisions

of the Second Amended and Restated Ownership Agreement (the "***Ownership Agreement***"). The

material provisions of the Ownership Agreement relating to a proposed disposition of the Power

Blocks are contained in Sections 8.1(b) and 17.14, which are discussed in some detail below.

10.     In paragraph 14 of their response, TEP and UNSE make reference to Section

8.1(b) of the Ownership Agreement, and then proceed to paraphrase the language as follows:

> Under Article 8.1(b) of the Ownership Agreement, **in relevant part**, the Debtors are prohibited from transferring their ownership interest unless: (i) the Debtors provide evidence, to the reasonable satisfaction of the non-transferring owners that the proposed transferee is financially capable, or provides reasonable financial assurances or guarantees, of fulfilling its obligations under any

> relevant agreements; (ii) all requisite regulatory approvals for the transfer have been obtained, and such approvals do not contain conditions that would reasonably be expected to materially and adversely affect the ownership or operation of the non-transferring owners; and (iii) the Debtors and their transferee execute and deliver to the other nontransferring owners an assignment agreement and any other documents and instruments as the non-transferring owners reasonably require, to confirm the Debtors' continuing obligation for all liabilities incurred by it under any relevant agreements and the proposed transferee's execution of a counterpart of each of the any relevant agreements and an acknowledgment that it is assuming all of the Debtors' obligations under the any relevant agreements.

(Emphasis added.)  The TEP/UNSE summary of Section 8.1(b) states that it is in "relevant part," raising the question as to what part (or parts) these parties omitted.  The answer is that their truncated summary of Section 8.1(b) omits two material provisions, discussed in turn below. The omitted provisions apply to the Debtors' current posture, and to the possible sale transaction the Debtors propose by their Sale Motion, making their omission quite significant.  The omission of these provisions is compounded by the fact that TEP and UNSE failed to attach the Ownership Agreement (or even relevant portions of the agreement) to their response.  Before turning to Section 8.1(b), however, there is an overarching section of the Ownership Agreement which TEP and UNSE have failed to disclose in any fashion – Section 17.14, discussed immediately below.

> **(1)    Material Omission #1: The Ownership Agreement Affirmatively Requires the Consent of TEP/UNSE, Contrary to their Assertion that they have Consent or Control Rights Over the Disposition of Debtors' Generation Capacity**

11.    Section 17.14(b) of the Ownership Agreement provides as follows:

> 17.14 Further Assurances for Financings and Transfers.

> (b) Each Party acknowledges that from time to time another Party may sell its Ownership Interest to a Person that is not a Party in accordance with Section 8.1. In furtherance of the foregoing, **each Party that is not the Transferring Party hereby agrees that it shall negotiate in good faith any reasonable request by the Transferring Party to amend or modify this Agreement and**

**the other applicable Definitive Agreements, or any of them, provided, that none of such proposed amendments or modifications shall be at the non-Transferring Party's expense or have any material adverse effect on such non-Transferring Party, that Party's Power Block, or the operation of the Gila River Power Station or ownership of the Common Facilities or its Expansion Facilities**. Each Party further agrees that, unless such documents or further assurances violate this Agreement or have a material adverse impact on such Party's Power Block, it shall provide such further assurances and execute such documents as are reasonably necessary to effectuate a Transfer at such Transferring Party's sole cost and expense.

Operating Agreement, § 17.14(b) (emphasis added).  There is no control or limitation upon the Debtors' ability to sell their two Power Blocks in the hands of the owners of other Power Blocks at the GRPS; instead, Section 17.14 of the Ownership Agreement *facilitates* any such sale by imposing an affirmative, good faith duty upon the other Power Block owners at GRPS to modify any existing agreements as requested by the acquiring party, as long as such modifications do not have a material adverse effect.

12.    Section 17.14 is by its terms a central provision of the Ownership Agreement when it comes to the situation of a Power Block being sold.  In such a situation, all parties to the Ownership Agreement have expressly agreed to make any modifications to any of the parties' agreements at the GRPS, limited only to the extent that any requested modifications would have a material adverse impact upon the non-selling owners of Power Blocks.  Yet the TEP/UNSE Response has failed to disclose the provisions of Section 17.14.  Interested parties must be made aware of Section 17.14, as it is a material term that in fact fosters the ability of interested parties to acquire one or both of the Debtors' Power Blocks.

**(2)    Material Omission #2: The Financial Assurance Provision of Section 8.1(b) of the Ownership Agreement Has an Exception to Consent Rights for Any Party, Including a New Special Purpose Entity, Whose Primary Purpose Is The Ownership, Lease Or Operation Of The Power Block(s)**

13.  Turning next to Section 8.1(b) of the Ownership Agreement -- the provision that TEP/UNSE asserts as limiting the Debtors' proposed sale -- the contention cannot be reconciled with the plain language of the section. The full text of Section 8.1(b) of the Ownership Agreement is as follows :

A Party shall be prohibited from Transferring its Ownership Interest or interest in any Expansion Facility to another Person unless (i) the Transferring Party provides evidence, to the reasonable satisfaction of the other Party(ies) (the "Non-Transferring Party(ies)"), that the proposed transferee is financially capable, or provides reasonable financial assurances or guarantees, of fulfilling its obligations under the Definitive Agreements and, if applicable, Development Agreements; **provided that this Section 8.1(b)(i) shall not apply to a Transfer that occurs as a consequence of or in connection with a default or breach under, or acceleration of, any financing arrangements secured by a first priority lien on assets or equity interests**, (ii) all requisite regulatory approvals to such Transfer have been obtained, and such approvals do not contain conditions that would reasonably be expected to materially and adversely affect the ownership or operation of the Non-Transferring Party(ies)'s Ownership Interest or interest in any Expansion Facility and (iii) the Transferring Party(ies) and its transferee execute and deliver to the other Parties an assignment agreement in form substantially similar to Appendix N and such other documents and instruments as the Non-Transferring Party(ies) may reasonably require, to confirm (A) the Transferring Party's continuing obligation for all liabilities incurred by it under the Definitive Agreements and, if applicable, Development Agreements, to the extent that such liabilities are incurred prior to the effective date of the Transfer and (B) the proposed transferee's execution of a counterpart of each of the Definitive Agreements and, if applicable, Development Agreements, and an acknowledgment that it is assuming all of the Transferring Party's obligations under the Definitive Agreements and, if applicable, Development Agreements, to the extent that such obligations arise or accrue after the date of the Transfer; provided that this Section 8.1(b)(iii) shall not apply to a Transfer of the equity interests in a Transferring Party to the extent such Transferring Party is a party to such Definitive Agreements and, if applicable, such Development Agreements. **Notwithstanding the foregoing, the Parties agree and acknowledge that (x) a proposed transferee consisting of an entity whose primary purpose is the ownership, lease or operation of the Power**

> **Block(s) and the Ownership Interest to be Transferred to such entity pursuant to the terms of this Section 8.1 shall satisfy the requirement set forth in clause (i) of this Section 8.1(b) and** (y) where a Party Transfers its interest in the Expansion Facilities to any wholly-owned subsidiary that is not (or does not contemporaneously with such Transfer become) a Party, such Transferring Party shall remain jointly and severally liable with such subsidiary for all of the Transferring Party's and its subsidiary's obligations under the Definitive Agreements and, if applicable, Development Agreements.

Ownership Agreement, Exhibit "B" hereto (emphases added).  The Debtors will address the two highlighted provisions in turn.

14.    Taking the second highlighted provision of Section 8.1(b) first, this proviso addresses the situation expressly contemplated by the Debtors' propose sale or other disposition of their two Power Blocks. The plain meaning of this language is that any transfer to an entity whose primary purpose is the ownership of a Power Block is deemed to satisfy Section 8.1(b) in all respects.  Just about every buyer in a Section 363 sale forms a special purpose acquisition vehicle for the primary purpose of acquiring the assets being auctioned.  A prospective bidder will likely establish one or more special purpose entities -- just as the Debtors did when they acquired each of their two Power Blocks. This carve-out in Section 8.1(b) is a clear and express exception to the financial assurance condition otherwise set forth in that section.  There is no ambiguity requiring any elaboration on the reasons for this carve-out, but suffice it to say, if a buyer has the wherewithal to acquire and operate one or both Power Blocks, this carve-out recognizes that such a party likely also has the means to carry out all operational obligations at the GRPS. In any event, a buyer of an entire Power Block satisfies this provision and requires no approval from TEP or UNSE, or from any other block owner.  Simply stated, a special purpose entity formed to acquire a power block is pre-qualified to do so.

    (3)    **Material Omission #3: The Financial Assurance Provision in Section 8.1(b) is Also Subject to an Exception Where, as Here, The Debtors are in Default Under their Senior Secured Credit Facility**

15.    A second important carve-out to the financial assurances provisions in clause (i) of Section 8.1(b) relates to events following a default under the Debtors' senior secured credit facility.  The proviso at the end of clause (i) states that "this Section 8.1(b)(i) shall not apply to a Transfer that occurs as a consequence of or in connection with a default or breach under, or acceleration of, any financing arrangements secured by a first priority lien on assets or equity interests."  Exhibit "B", § 8.1(b). The Debtors were in default under their prepetition credit facilities prior to the Petition Date. These obligations are secured by a first priority lien on the Debtors' assets.  Moreover, the filing of the Bankruptcy Case constituted an event of default and a deemed acceleration event under the prepetition credit facility.  The transaction proposed by the Sale Motion will be a "Transfer that occurs as a consequence" of such default, breach and acceleration of the Debtors' secured debt obligations, and therefore the proviso of clause (i) of Section 8.1(b) of the Ownership Agreement is satisfied.

16.    Additionally, Section 4.7 of the Ownership Agreement expressly provides that "consent of the Owner Committee is not required" with respect to several matters, including the sale or assignment of a Power Block (subject only to the minimum criteria set forth in Section 8.1).

17.    For these reasons, TEP's asserted "consent" and "approval rights" are patently false.  Given that the plain language of the Ownership Agreement, the Debtors believe that TEP's assertions were not made in good faith and reserve their rights accordingly.

18.    Additionally, TEP seems to assert that any attempt to transfer a Power Block to multiple owners must not be allowed.  The irony of this assertion is fairly rich.  The Debtors consented to the transfer of Power Block 3 from its previous owner to TEP and UNSE as joint

owners.  Absent TEP and UNSE being able to demonstrate that there is a material and adverse

impact on their own Power Block, such a sale isn't just possible, TEP must consent to such a

transaction pursuant to the plain language of the Ownership Agreement.  It is difficult not to

conclude that this is a thinly veiled attempt to discourage bids from parties seeking to buy a

portion of a Power Block or to team up with another buyer to buy a portion of a Power Block.

> **(4)    False Statement #1: The TEP/UNSE Response Incorrectly Contends that TEP and UNSE Control Power Blocks I and II Through Voting Power Over the Debtors' Proposed Sale of Those Power Blocks**

19.    TEP and UNSE assert that they have voting powers regarding the Debtors'

proposed sale of Power Blocks I and II.  Notwithstanding the fact that the plain language of

Section 8.1(b) of the Ownership Agreement does not bestow upon TEP or UNSE approval rights

as to any transfer of a Power Block owned by the Debtors, TEP has nonetheless asserted voting

control:

> Specifically, any transfer of the Debtors' ownership interest in Power Blocks I and II of GRPS is governed by Article 8.1 of the Ownership Agreement, and is subject to the vote of TEP, UNSE and GRP.

TEP/UNSE Response, ¶ 13.   This statement is simply not true.  There is no provision in the

Ownership Agreement which affords any voting control in favor of TEP and/or UNSE in this

context.  In fact, the ability of an owner to sell or assign an ownership interest in a Power Block

is specifically reserved to each individual owner, in Section 4.7(d) of the Ownership Agreement,

subject only to the provisions of Section 8.1 described above.  As set forth above, Section 8.1

hardwires certain pre-approved categories of transfers (two of which apply to the Debtors'

proposed sales) that are not subject to any such approval or consent.

> **(5)     False Statement #2: The TEP/UNSE Response  Does Not Accurately Represent the Nature of FERC Approval**

20.     TEP/UNSE refers to the FERC approval as "the elephant in the room" and argues that the Bid Procedures must reflect the "true extent" of the FERC approval process so that parties are not "doomed" to participate in a "quixotic exercise."  FERC's standard for approving a sale of a generation facility under Section 203 of the Federal Power Act is long established and well understood by the types of sophisticated parties that are likely to bid.  Indeed, TEP/UNSE concedes that "any party seeking to become a Qualified Bidder" will be aware of the need for FERC approval.

21.     Neither potential bidders nor Debtors have any incentive to embark on a transaction that could not obtain FERC approval.  In any event, there is no colorable basis for TEP's/UNSE's request that potential bidders be required to disclose their strategy for obtaining FERC approval. Any such disclosure to market competitors -- including to TEP/UNSE – may implicate commercially sensitive information about the bidder's plans for the southwestern power markets.  TEP/UNSE's attempt to gain this information is inappropriate, and may indeed run afoul of regulatory actions in which TEP and/or UNSE are currently involved.

> **(6)     The Debtors Have Already Noted Regulatory Approval Requirements in Their Bid Procedures.**

22.     The Debtors have noted that applicable regulatory approvals will be a condition precedent for any buyer to acquire an interest in a power block.  Neither the Debtors nor TEP know each specific regulatory approval to which each bidder is subject.   Despite TEP's numerous admonitions about FERC approval, the Ownership Agreement does not once specifically mention FERC approval.  Indeed, the Ownership Agreement itself only generically refers to "all requisite regulatory approvals" without delineating which specific requirements

apply.  Rather than try to list each such requirement, the Debtors have simply opted to use the generic convention of applicable regulatory approvals as set forth in the Ownership Agreement.

23.     For all of TEP's assertions about FERC regulatory constraints, it seems that TEP is not mindful of its own limitations under FERC in that it seeks "superior rights" (TEP's own words) in conjunction with the vetting, approval and ultimate disposition of competing generation assets.  The reason for FERC approval is to prevent competing generators to engage in just this sort of conduct.  It is remarkable that TEP would seek such rights, while simultaneously making vague references to FERC approval.  The Debtors reserve the right to raise such issues with FERC when and as appropriate.  The Debtors also reserve their rights to conduct discovery regarding communications by TEP/UNSE with other potentially interested parties regarding required approvals, or regarding any other matters related to the Debtors' sale process.

**(7)     Continuing Obligations and Form of Assignment**

24.     In the Wallander Declaration and the first day pleadings, the Debtors made it quite clear that they intended to pay all of their pre-petition obligations relative to the common ownership arrangements.  The Debtors have sought and obtained approval to make such payments, both pre- and postpetition, and the Debtors have obtained postpetition financing to provide for all such payments.  The Debtors have already made significant payments to co-owners at GRPS on account of such pre-petition obligations.  The Debtors' DIP Budget provides full funding to pay all such obligations in the ordinary course.  In their first day pleadings, the Debtors also noted that obligations under the Ownership Agreement run with the land as one of the reasons for obtaining such financing and making such payments.  The Debtors' secured lender agreed, and funded payment of these amounts.  The TEP/UNSE Response ignores the extraordinary relief that the Debtors have succeed in obtaining, which has authorized the Debtors

to pay all known prepetition amounts, and expected postpetition amounts, in the categories in which TEP/UNSE profess concern. With respect to post-sale performance, the Debtors have fully acknowledged that any future owner must agree to be a party to and abide by the common ownership arrangements.

25.     As set forth above, Appendix N to the Ownership Agreement provides a pre-approved form of assignment. The requirements of this assignment are stated therein and will be incumbent upon any new owner of one or both of the Debtors' Power Blocks. The only party suggesting that this form is not "good enough" is TEP, which seems to imply it has extra-contractual rights to meddle in the sale of another owner's Power Block. As set forth above, Section 17.14 of the Ownership Agreement plainly makes it clear that, far from TEP's asserted "superior rights", TEP is contractually required to consent to the transfer so long as the minimum transfer criteria are met.

> **(8)     The Take-Away from the TEP/UNSE Response: It Should Be Disregarded in its Entirety**

26.     The omissions of relevant provisions of the Ownership Agreement by TEP and UNSE, coupled with their stated interest in potentially being a bidder, merit a conclusion that at this stage of the process, the TEP/UNSE Response should be disregarded. TEP's and UNSE's omissions may implicate the duty of candor to the tribunal, and all rights are reserved in that respect. Similarly, to the extent that further investigation may reveal potential claims for anticipatory breach of contract, tortious interference, violations of the Federal Power Act, or other claims, the Debtors reserve all such rights.

> **B.     The U.S. Trustee Objection**

> > **(1)     The Open Nature of the Debtors' Process is More Likely to Achieve a Market Test Than a Process with Additional Constraints**

27.     The Debtors' process is about as open a process as one can conceive of in the context of chapter 11 cases such as these.  The process is a genuine search for value, with as few barriers to entry as possible.  The U.S. Trustee sees the reduced barriers in these cases as an issue, when compared to the more common situation in which there is a floor price or, indeed, a fully executed APA for a transaction that the Debtors are contractually bound to pursue unless and until a competing bidder arrives with a topping bid. Yet the more open a sale process is, the better it should be at diving market value for the Debtors' assets.

28.     To foster an organized bidding process, the Debtors will file a proposed form of APA.  This will give potential bidders the comfort that all bidders will be starting from the same proposed form, so that bid submissions will be accompanied with markups, and stakeholders can compare markups in order to "score" the bids reflected in each party's proposed APA. Otherwise, the current process has very basic parameters, chiefly a time limitation that is a necessity given the cost of administered these chapter 11 cases and the cost of funding the Debtors' operations.

### (2)     A Streamlined Filing and Approval Process for Any Proposed Stalking Horse is Warranted

29.     The U.S. Trustee objects to pre-approval of a range of stalking horse bidder protections.  The Debtors recognize that a further procedure is warranted with respect to approval of any actual proposed stalking horse. Accordingly, the Debtors intend to propose a modified form of bidding procedures order, consistent with the proposed revised version attached as Exhibit "A" hereto, which would include a streamlined filing and approval procedure to seek approval of a stalking horse with bidder protections.  With respect to the proposed findings in the form or Bid Procedures Order regarding breakup fee approval, the Debtors expect

that language can be negotiated to clarify that the findings will be effective to the extent that the

Debtors pursue a specific breakup fee and stalking horse approval request.

### (3)    Responses to Additional U.S. Trustee Objection Points

30.    The remainder of the U.S. Trustee's concerns, and the Debtors' responses thereto,

are summarized as follows:

| U.S. Trustee Objection | Debtors' Response |
| --- | --- |
| 1. A breakup fee may not be awarded superpriority status. | This objection is misplaced. A stalking horse is entitled to all assurances possible that its administrative claim has the highest priority, and has no risk of being lumped with other ordinary administrative expenses, as the benefit to the estate is of a materially different character than ordinary administrative claims. |
| 2. Sale terms will not be known until the auction concludes. | The Debtors' proposed sale process is a model of what an auction should be - a free and open contest for the highest and best bid(s) for the Debtors' assets.  By definition, the auction is the process by which the highest and best bid – and all relevant sale terms – is determined. A model APA will be proposed by the Debtors at the outset of the process. |
| 3. The Debtors are unwilling to serve the proposed terms of the sale promptly after the close of the auction. | The Debtors have agreed to file the final proposed APA(s) by Friday, May 6, two days after the auction. The Debtors can certainly also publicly report the outcome of the auction through a filing within a few hours of when the auction gavel falls, in summary form. |
| 4. The Debtors are not permitting enough time for parties to object, as between the time of the announcement of auction results and the sale hearing. | The Debtors are willing to be flexible on this timing point: if the sale hearing is, as currently proposed, 5 or 6 calendar days after the Debtors file |

| | the final APA(s), it is reasonable to request that objectors file objections the day prior to the sale hearing to afford the parties and the Court some advance notice of objectors' issues. The Court will no doubt be accommodating of parties who seek to raise supplemental objection issues at the sale hearing, to the extent they can demonstrate that they did not have sufficient time to identify a particular issue. |
|---|---|
| 5. The Debtors are not providing sufficient notice of assumption and assignment to counterparties. | The gap between the Auction and the Sale hearing of a week or more is considerably longer than is typical in section 363 sales, and this concern is therefore misplaced.  Just as in every other section 363/365 process in modern chapter 11 cases, all counterparties are on notice at the very outset that their contracts are slated for possible assumption and assignment, and by definition the proposed assignee (if any) is not determined until the auction or thereafter. The definitive APA(s) are to be filed May 6, 2016, which will identify all or substantially assumed and assigned agreements well in advance of the sale hearing. |
| 6. The Debtors should not consult with the Prepetition Lenders and DIP Lenders if they bid. | The Debtors will not consult with the secured lenders with respect to assets that are the subject of ongoing and active bidding by the Lenders. Nonetheless, there are multiple scenarios in which consultation rights are still required, even if the Lenders have bid or may bid on certain assets. For example, if the Lenders are not bidding on Power Block I (or bid initially but dropped out), there must be consultation rights on Power Block I bidding going forward, even if a Lender or designee is actively |

| | bidding on Power Block II. The consultation rights are ones that the Debtors will manage, in a manner consistent with their fiduciary duties, and consistent with their commitment to maintain the integrity of their bidding process. |
|---|---|
| 7. The Debtors seek broad latitude to modify the Bid Procedures. | This is a standard feature of bid procedures in typical section 363 asset sale situations. |
| 8. Creditors should be allowed to attend the auction. | The Debtors are amenable to allowing creditors to attend the auction, while reserving their rights to maintain the integrity and efficient operation of the auction. |

C.    **Maricopa County's Objection Is a Sale Objection and Need Not Be Addressed at the Bid Procedures Stage**

31.    The objection filed by Maricopa County (the "***Maricopa Objection***")[3] is by its terms a sale objection.  The County objects to entry of a final sale approval order to the extent such order does not provide for the retention of the County's statutory property tax liens to secure the payment of the 2015 and 2016 taxes when they become due. The County also seeks clarification that any purchaser will assume obligations to pay 2016 taxes, which the County states will become due after the closing of any sale that occurs after November 1, 2016.

32.    The Bid Procedures Request being pursued by the Debtors do not implicate any potential tax claims or liens respecting the Debtors' property.  Any concerns of the County can be addressed in the proposed form of sale approval order.  The Debtors hope to have the sale approval hearing May 11 or May 12, 2016. In the interim, the Debtors will confer with the

---

3 Maricopa County Treasurer's Objection To Debtors' Motion For Entry Of Orders (i) Establishing Bidding And Sale Procedures (ii) Approving The Sale Of Assets And (iii) Granting Related Relief

County in an effort to agree upon language in the proposed sale approval order to satisfy the County's concerns.

33.     Though the allowable amount and procedural status of any tax claims of the County are also not at issue with respect to the Bid Procedures Request, the Debtors will note that the County's assessment of the Debtors' properties at the GRPS have been the subject of legal proceedings.  The Debtors initiated proceedings to challenge the County's  taxation of the Debtors' properties for the three years prior to the Petition date and prevailed.  The County appealed, and its appeal is pending. The Debtors also commenced proceedings to challenge the 2016 taxes prior to the Petition Date. With respect to any foreseeable amount of taxes that are determined to be due to the County from the Debtors, the Debtors believe that they have fully provided for the payment of such amounts in the Debtors' DIP Budget.

### III.    CONCLUSION

34.    For the reasons set forth in this Reply and in the Bid Procedures Request set forth in the Sale Motion, the Debtors respectfully request that this Court grant their Bid Procedures Request using the Debtors' proposed form of Bid Procedures Order.

Dated: March 1, 2016
Wilmington, Delaware

DRINKER BIDDLE & REATH LLP

*/s/ Steven K. Kortanek*
Steven K. Kortanek (Del. Bar No. 3106)
Howard A. Cohen (Del. Bar No. 4082)
Joseph N. Argentina, Jr. (Del. Bar No. 5453)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Tel:  (302) 467-4200
Fax: (302) 467-4201
Steven.Kortanek@dbr.com
Howard.Cohen@dbr.com
Joseph.Argentina@dbr.com

-and-

VINSON & ELKINS LLP
David S. Meyer (NY 4576344)
Jessica C. Peet (NY 5265913)
Lauren R. Kanzer (NY 5216635)
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Tel:  (212) 237-0000
Fax: (212) 237-0100
dmeyer@velaw.com
jpeet@velaw.com
lkanzer@velaw.com

Paul E. Heath (TX 09355050)
Reese A. O'Connor (TX 24092910)
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201
Tel:  (214) 220-7700
Fax: (214) 220-7716
pheath@velaw.com
roconnor@velaw.com

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION